*392 Justice Kennedy
delivered the opinion of the Court.
To address pressing issues related to the large number of aliens within its borders who do not have a lawful right to *393 be in this country, the State of Arizona in 2010 enacted a statute called the Support Our Law Enforcement and Safe Neighborhoods Act. The law is often referred to as S. B. 1070, the version introduced in the State Senate. See also H. B. 2162, 49th Leg., 2d Reg. Sess. (2010) (amending S. B. 1070). Its stated purpose is to “discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States.” Note following Ariz. Rev. Stat. Ann. § 11-1051 (West 2012). The law’s provisions establish an official state policy of “attrition through enforcement.” Ibid. The question before the Court is whether federal law pre-empts and renders invalid four separate provisions of the state law.
I
The United States filed this suit against Arizona, seeking to enjoin S. B. 1070 as pre-empted.- Four provisions of the law are at issue here. Two create new state offenses. Section 3 makes failure to comply with federal alien-registration requirements a state misdemeanor. Ariz. Rev. Stat. Ann. § 13-1509 (West Supp. 2011). Section 5, in relevant part, *394 makes it a misdemeanor for an unauthorized alien to seek or engage in work in the State; this provision is referred to as § 5(C). See § 13-2928(C). Two other provisions give specific arrest authority and investigative duties with respect to certain aliens to state and local law enforcement officers. Section 6 authorizes officers to arrest without a warrant a person “the officer has probable cause to believe . . . has committed any public offense that makes the person removable from the United States.” § 13-3883(A)(5). Section 2(B) provides that officers who conduct a stop, detention, or arrest must in some circumstances make efforts to verify the person’s immigration status with the Federal Government. See § 11-1051(B) (West 2012).
The United States District Court for the District of Arizona issued a preliminary injunction preventing the four provisions at issue from taking effect. 703 F. Supp. 2d 980, 1008 (2010). The Court of Appeals for the Ninth Circuit affirmed. 641 F. 3d 339, 366 (2011). It agreed that the United States had established a likelihood of success on its pre-emption claims. The Court of Appeals was unanimous in its conclusion that §§ 3 and 5(C) were likely pre-empted. Judge Bea dissented from the decision to uphold the preliminary injunction against §§ 2(B) and 6. This Court granted certiorari to resolve important questions concerning the interaction of state and federal power with respect to the law of immigration and alien status. 565 U. S. 1092 (2011).
nH I
A
The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. See Toll v. Moreno, 458 U. S. 1, 10 (1982); see generally S. Legomsky & C. Rodriguez, Immigration and Refugee Law and Policy 115-132 (5th ed. 2009). This authority rests, in part, on the National Government’s constitutional power to “establish an uniform Rule of Naturaliza *395 tion,” Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations, see Toll, supra, at 10 (citing United States v. Curtiss-Wright Export Corp., 299 U. S. 304, 318 (1936)).
The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws. See, e. g., Brief for United Mexican States as Amicus Curiae; see also Harisiades v. Shaughnessy, 342 U. S. 580, 588-589 (1952). Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad. See Brief for Madeleine K. Albright et al. as Amici Curiae 24-30.
It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States. See Chy Lung v. Freeman, 92 U. S. 275, 279-280 (1876); see also The Federalist No. 3, p. 39 (C. Rossiter ed. 2003) (J. Jay) (observing that federal power would be necessary in part because “bordering States ... under the impulse of sudden irritation, and a quick sense of apparent interest or injury” might take action that would undermine foreign relations). This Court has reaffirmed that “[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country’s own nationals when those nationals are in another country.” Hines v. Davidowitz, 312 U. S. 52, 64 (1941).
Federal governance of immigration and alien status is extensive and complex. Congress has specified categories of aliens who may not be admitted to the United States. See 8 U. S. C. § 1182. Unlawful entry and unlawful reentry into the country are federal offenses. §§ 1325, 1326. Once here, aliens are required to register with the Federal Government *396 and to carry proof of status on their person. See §§ 1301-1306. Failure to do so is a federal misdemeanor. §§ 1304(e), 1306(a). Federal law also authorizes States to deny nonciti-zens a range of public benefits, § 1622; and it imposes sanctions on employers who hire unauthorized workers, § 1324a.
Congress has specified which aliens may be removed from the United States and the procedures for doing so. Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law. See § 1227. Removal is a civil, not criminal, matter. A principal feature of the removal system is the broad discretion exercised by immigration officials. See Brief for Former Commissioners of the United States Immigration and Naturalization Service as Amici Curiae 8-13 (hereinafter Brief for Former INS Commissioners). Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal. See § 1229a(c)(4); see also, e.g., §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure).
Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual ease may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation’s international relations. Returning an alien tq his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission. The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a *397 real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation’s foreign policy with respect to these and other realities.
Agencies in the Department of Homeland Security play a major role in enforcing the country’s immigration laws. United States Customs and Border Protection (CBP) is responsible for determining the admissibility of aliens and securing the country’s borders. See Dept, of Homeland Security, Office of Immigration Statistics, Immigration Enforcement Actions: 2010, p. 1 (2011). In 2010, CBP’s Border Patrol apprehended almost half a million people. Id., at 3. Immigration and Customs Enforcement (ICE), a second agency, “conducts criminal investigations involving the enforcement of immigration-related statutes.” Id., at 2. ICE also operates the Law Enforcement Support Center. LESC, as the Center is known, provides immigration status information to federal, state, and local officials around the clock. See App. 91. ICE officers are responsible “for the identification, apprehension, and removal of illegal aliens from the United States.” Immigration Enforcement Actions, at 2. Hundreds of thousands of aliens are removed by the Federal Government every year. See id., at 4 (reporting there were 387,242 removals, and 476,405 returns without a removal order, in 2010).
B
The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States. Arizona bears many of the consequences of unlawful immigration. Hundreds of thousands of deportable aliens are apprehended in Arizona each year. Dept, of Homeland Security, Office of Immigration Statistics, 2010 Yearbook of Immigration Statistics 93 (2011) (Table 35). Unauthorized aliens who remain in the State constitute, by one estimate, almost 6% of the population. See J. Passel & D. Cohn, Pew Hispanic Center, *398 U. S. Unauthorized Immigration Flows Are Down Sharply Since Mid-Decade 3 (2010). And in the State’s most populous county, these aliens are reported to be responsible for a disproportionate share of serious crime. See, e. g., S. Camarota & J. Vaughan, Center for Immigration Studies, Immigration and Crime: Assessing a Conflicted Issue 16 (2009) (Table 3) (estimating that unauthorized aliens constitute 8.9% of the population and are responsible for 21.8% of the felonies in Maricopa County, which includes Phoenix).
Statistics alone do not capture the full extent of Arizona’s concerns. Accounts in the record suggest there is an “epidemic of crime, safety risks, serious property damage, and environmental problems” associated with the influx of illegal migration across private land near the Mexican border. Brief for Petitioners 6. Phoenix is a major city of the United States, yet signs along an interstate highway 30 miles to the south warn the public to stay away. One reads, “DANGER—PUBLIC WARNING—TRAVEL NOT RECOMMENDED / Active Drug and Human Smuggling Area / Visitors May Encounter Armed Criminals and Smuggling Vehicles Traveling at High Rates of Speed.” App. 170 (punctuation altered); see also Brief for Petitioners 5-6. The problems posed to the State by illegal immigration must not be underestimated.
These concerns are the background for the formal legal analysis that follows. The issue is whether, under preemption principles, federal law permits Arizona to implement the state-law provisions in dispute.
J-H b-i I—I
Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect. See Gregory v. Ashcroft, 501 U. S. 452, 457 (1991); U. S. Term Limits, Inc. v. Thornton, 514 U. S. 779, 838 (1995) (Kennedy, J., concurring). From the existence of two sovereigns fol *399 lows the possibility that laws can be in conflict or at cross-purposes. The Supremacy Clause provides a clear rule that federal law “shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.” Art. VI, cl. 2. Under this principle, Congress has the power to pre-empt state law. See Crosby v. National Foreign Trade Council, 530 U. S. 363, 372 (2000); Gibbons v. Ogden, 9 Wheat. 1, 210-211 (1824). There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision. See, e. g., Chamber of Commerce of United States of America v. Whiting, 563 U. S. 582, 592 (2011).
State law must also give way to federal law in at least two other circumstances. First, the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance. See Gade v. National Solid Wastes Management Assn., 505 U. S. 88, 115 (1992) (Souter, J., dissenting). The intent to displace state law altogether can be inferred from a framework of regulation “so pervasive . . . that Congress left no room for the States to supplement it” or where there is a “federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.” Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230 (1947); see English v. General Elec. Co., 496 U. S. 72, 79 (1990).
Second, state laws are pre-empted when they conflict with federal law. Crosby, supra, at 372. This includes cases where “compliance with both federal and state regulations is a physical impossibility,” Florida Lime & Avocado Growers, Inc. v. Paul, 373 U. S. 132, 142-143 (1963), and those instances where the challenged state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” Hines, 312 U. S., at 67; see also *400 Crosby, supra, at 373 (“What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects”)- In pre-emption analysis, courts should assume that “the historic police powers of the States” are not superseded “unless that was the clear and manifest purpose of Congress.” Rice, supra, at 230; see Wyeth v. Levine, 555 U. S. 555, 565 (2009).
The four challenged provisions of the state law each must be examined under these pre-emption principles.
IV
A

Section S

Section 3 of S. B. 1070 creates a new state misdemeanor. It forbids the “willful failure to complete or carry an alien registration document ... in violation of 8 United States Code § 1304(e) or 1306(a).” Ariz. Rev. Stat. Ann. § 13— 1509(A). In effect, § 3 adds a state-law penalty for conduct proscribed by federal law. The United States contends that this state enforcement mechanism intrudes on the field of alien registration, a field in which Congress has left no room for States to regulate. See Brief for United States 27, 31.
The Court discussed federal alien-registration requirements in Hines, supra. In 1940, as international conflict spread, Congress added to federal immigration law a “complete system for alien registration.” Id., at 70. The new federal law struck a careful balance. It punished an alien’s willful failure to register but did not require aliens to carry identification cards. There were also limits on the sharing of registration records and fingerprints. The Court found that Congress intended the federal plan for registration to be a “single integrated and all-embracing system.” Id., at 74. Because this “complete scheme ... for the registration of aliens” touched on foreign relations, it did not allow the States to “curtail or complement” federal law or to “enforce *401 additional or auxiliary regulations.” Id., at 66-67. As a consequence, the Court ruled that Pennsylvania could not enforce its own alien-registration program. See id., at 59, 74.
The present regime of federal regulation is not identical to the statutory framework considered in Hines, but it remains comprehensive. Federal law now includes a requirement that aliens carry proof of registration. 8 U. S. C. § 1804(e). Other aspects, however, have stayed the same. Aliens who remain in the country for more than 30 days must apply for registration and be fingerprinted. Compare § 1302(a) with § 452(a) (1940 ed.). Detailed information is required, and any change of address has to be reported to the Federal Government. Compare §§ 1304(a), 1305(a) (2006 ed.) with §§ 455(a), 456 (1940 ed.). The statute continues to provide penalties for the willful failure to register. Compare § 1306(a) (2006 ed.) with §457 (1940 ed.).
The framework enacted by Congress leads to the conclusion here, as it did in Hines, that the Federal Government has occupied the field of alien registration. See American Ins. Assn. v. Garamendi, 539 U. S. 396, 419, n. 11 (2003) (characterizing Hines as a field pre-emption case); Pennsylvania v. Nelson, 350 U. S. 497, 504 (1956) (same); see also Dinh, Reassessing the Law of Preemption, 88 Geo. L. J. 2085, 2098-2099, 2107 (2000) (same). The federal statutory directives provide a full set of standards governing alien registration, including the punishment for noncompliance. It was designed as a “‘harmonious whole.’” Hines, supra, at 72. Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. Field pre-emption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards. See Silkwood v. Kerr-McGee Corp., 464 U. S. 238, 249 (1984).
Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of *402 aliens within the Nation’s borders. If §3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, “diminish[ing] the [Federal Government] ⅛ control over enforcement” and “detracting] from the ‘integrated scheme of regulation’ created by Congress.” Wisconsin Dept. of Industry v. Gould Inc., 475 U. S. 282, 288-289 (1986). Even if a State may make violation of federal law a crime in some instances, it cannot do so in a field (like the field of alien registration) that has been occupied by federal law. See California v. Zook, 336 U. S. 725, 730-731, 733 (1949); see also In re Loney, 134 U. S. 372, 375-376 (1890) (States may not impose their own punishment for perjury in federal courts).
Arizona contends that § 3 can survive pre-emption because the provision has the same aim as federal law and adopts its substantive standards. This argument not only ignores the basic premise of field pre-emption—that States may not enter, in any respect, an area the Federal Government has reserved for itself—but also is unpersuasive on its own terms. Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted. Cf. Buckman Co. v. Plaintiffs’ Legal Comm., 531 U. S. 341, 347-348 (2001) (States may not impose their own punishment for fraud on the Food and Drug Administration); Wisconsin Dept., supra, at 288 (States may not impose their own punishment for repeat violations of the National Labor Relations Act). Were §3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would fi-ustrate federal policies.
There is a further intrusion upon the federal scheme. Even where federal authorities believe prosecution is appropriate, there is an inconsistency between § 3 and federal law *403 with respect to penalties. Under federal law, the failure to carry registration papers is a misdemeanor that may be punished by a fine, imprisonment, or a term of probation. See 8 U. S. C. § 1304(e) (2006 ed.); 18 U. S. C. § 3561. State law, by contrast, rules out probation as a possible sentence (and also eliminates the possibility of a pardon). See Ariz. Rev. Stat. Ann. § 13-1509(D). This state framework of sanctions creates a conflict with the plan Congress put in place. See Wisconsin Dept., supra, at 286 (“[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity” (internal quotation marks omitted)).
These specific conflicts between state and federal law simply underscore the reason for field pre-emption. As it did in Hines, the Court now concludes that, with respect to the subject of alien registration, Congress intended to preclude States from “complement[ing] the federal law, or enforcing] additional or auxiliary regulations.” 312 U. S., at 66-67. Section 3 is pre-empted by federal law.
B

Section 5(C)

Unlike §3, which replicates federal statutory requirements, §5(C) enacts a state criminal prohibition where no federal counterpart exists. The provision makes it a state misdemeanor for “an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor” in Arizona. Ariz. Rev. Stat. Ann. §13-2928(C). Violations can be punished by a $2,500 fine and incarceration for up to six months. See § 13-2928(F); see also §§ 13-707(A)(1) (West 2010); 13-802(A); 13-902(A)(5) (West Supp. 2011). The United States contends that the provision upsets the balance struck by the Immigration Reform and Control Act of 1986 (IRCA) and must be pre-empted as an obstacle to the federal plan of regulation and control.
*404 When there was no comprehensive federal program regulating the employment of unauthorized aliens, this Court found that a State had authority to pass its own laws on the subject. In 1971, for example, California passed a law imposing civil penalties on the employment of aliens who were “not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers.” 1971 Cal. Stats. ch. 1442, § 1(a). The law was upheld against a pre-emption challenge in De Canas v. Bica, 424 U. S. 351 (1976). De Canas recognized that “States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.” Id., at 356. At that point, however, the Federal Government had expressed no more than “a peripheral concern with [the] employment of illegal entrants.” Id., at 360; see Whiting, 563 U. S., at 588.
Current federal law is substantially different from the regime that prevailed when De Canas was decided. Congress enacted IRCA as a comprehensive framework for “combating the employment of illegal aliens.” Hoffman Plastic Compounds, Inc. v. NLRB, 535 U. S. 137, 147 (2002). The law makes it illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers. See 8 U. S. C. §§ 1324a(a)(1)(A), (a)(2). It also requires every employer to verify the employment authorization status of prospective employees. See §§ 1324a(a)(1)(B), (b); 8 CFR § 274a.2(b) (2012). These requirements are enforced through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated the provisions. See 8 U. S. C. §§ 1324a(e)(4), (f); 8 CFR § 274a.10.
This comprehensive framework does not impose federal criminal sanctions on the employee side (i. e., penalties on aliens who seek or engage in unauthorized work). Under federal law some civil penalties are imposed instead. With certain exceptions, aliens who accept unlawful employment *405 are not eligible to have their status adjusted to that of a lawful permanent resident. See 8 U. S. C. §§ 1255(c)(2), (c)(8). Aliens also may be removed from the country for having engaged in unauthorized work. See § 1227(a)(1) (C)(i); 8 CFR § 214.1(e). In addition to specifying these civil consequences, federal law makes it a crime for unauthorized workers to obtain employment through fraudulent means. See 18 U. S. C. § 1546(b). Congress has made clear, however, that any information employees submit to indicate their work status “may not be used” for purposes other than prosecution under specified federal criminal statutes for fraud, perjury, and related conduct. See 8 U. S. C. §§ 1324a(b)(5), (d)(2)(F)-(G).
The legislative background of IRCA underscores the fact that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment. A commission established by Congress to study immigration policy and to make recommendations concluded these penalties would be “unnecessary and unworkable.” U. S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission on Immigration and Refugee Policy With Supplemental Views by Commissioners 65-66 (1981); see § 4, 92 Stat. 907. Proposals to make unauthorized work a criminal offense were debated and discussed during the long process of drafting IRCA. See Brief for Service Employees International Union et al. as Amici Curiae 9-12. But Congress rejected them. See, e. g., 119 Cong. Rec. 14184 (1973) (statement of Rep. Dennis). In the end, IRCA’s framework reflects a considered judgment that making criminals out of aliens engaged in unauthorized work—aliens who already face the possibility of employer exploitation because of their removable status—would be inconsistent with federal policy and objectives. See, e. g., Hearings before Subcommittee No. 1 of the House Committee on the Judiciary, 92d Cong., 1st Sess., pt. 3, pp. 919-920 (1972) (statement of *406 Rep. Rodino, the eventual sponsor of IRCA in the House of Representatives).
IRCA’s express pre-emption provision, which in most instances bars States from imposing penalties on employers of unauthorized aliens, is silent about whether additional penalties may be imposed against the employees themselves. See 8 U.S.C. § 1324a(h)(2); Whiting, supra, at 587-588. But the existence of an “express pre-emption provisio[n] does not bar the ordinary working of conflict pre-emption principles” or impose a “ ‘special burden’ ” that would make it more difficult to establish the pre-emption of laws falling outside the clause. Geier v. American Honda Motor Co., 529 U. S. 861, 869-872 (2000); see Sprietsma v. Mercury Marine, 537 U. S. 51, 65 (2002).
The ordinary principles of pre-emption include the well-settled proposition that a state law is pre-empted where it “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Hines, 312 U. S., at 67. Under § 5(C) of S. B. 1070, Arizona law would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens. Although § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement. The Court has recognized that a “[cjonflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.” Motor Coach Employees v. Lockridge, 403 U. S. 274, 287 (1971). The correct instruction to draw from the text, structure, and history of IRCA is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment. It follows that a state law to the contrary is an obstacle to the regulatory system Congress chose. See Puerto Rico Dept. of Consumer Affairs v. ISLA Petroleum Corp., 485 U. S. 495, 503 (1988) (“Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then *407 the pre-emptive inference can be drawn—not from federal inaction alone, but from inaction joined with action”). Section 5(C) is pre-empted by federal law.
C

Section 6

Section 6 of S. B. 1070 provides that a state officer, “without a warrant, may arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States.” Ariz. Rev. Stat. Ann. § 13-3883(A)(5). The United States argues that arrests authorized by this statute would be an obstacle to the removal system Congress created.
As a general rule, it is not a crime for a removable alien to remain present in the United States. See INS v. Lopez-Mendoza, 468 U. S. 1032, 1038 (1984). If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent. When an alien is suspected of being removable, a federal official issues an administrative document called a “Notice to Appear.” See 8 U. S. C. § 1229(a); 8 CFR § 239.1(a). The form does not authorize an arrest. Instead, it gives the alien information about the proceedings, including the time and date of the removal hearing. See 8 U. S. C. § 1229(a)(1). If an alien fails to appear, an in absentia order may direct removal. § 1229a(b)(5)(A).
The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien’s arrest and detention “pending a decision on whether the alien is to be removed from the United States.” § 1226(a); see Memorandum from John Morton, Director, ICE, to All Field Office Directors et al., Exercising Prosecutorial Discretion Consistent With the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, *408 2011) (hereinafter 2011 ICE Memorandum) (describing factors informing this and related decisions). And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3). If no federal warrant has been issued, those officers have more limited authority. See 8 U. S. C. § 1357(a). They may arrest an alien for being “in the United States in violation of any [immigration] law or regulation,” for example, but only where the alien “is likely to escape before a warrant can be obtained.” § 1357(a)(2).
Section 6 attempts to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers. Under state law, officers who believe an alien is removable by reason of some “public offense” would have the power to conduct an arrest on that basis regardless of whether a federal warrant has issued or the alien is likely to escape. This state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case. This would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed.
This is not the system Congress created. Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer. A principal example is when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government. See § 1357(g)(1); see also § 1103(a)(10) (authority may be extended in the event of an “imminent mass influx of aliens arriving off the coast of the United *409 States”); § 1252c (authority to arrest in specific circumstance after consultation with the Federal Government); § 1324(c) (authority to arrest for bringing in and harboring certain aliens). Officers covered by these agreements are subject to the Attorney General’s direction and supervision. § 1357(g)(3). There are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable. See Padilla v. Kentucky, 559 U. S. 356, 379-380 (2010) (Alito, J., concurring in judgment). As a result, the agreements reached with the Attorney General must contain written certification that officers have received adequate training to carry out the duties of an immigration officer. See 11357(g)(2); cf. 8 CFR §§ 287.5(c) (arrest power contingent on training), 287.1(g) (defining the training).
By authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principle that the removal process is entrusted to the discretion of the Federal Government. See, e. g., Reno v. American-Arab Anti-Discrimination Comm., 525 U. S. 471, 483-484 (1999); see also Brief for Former INS Commissioners 8-13. A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice. See Jama v. Immigration and Customs Enforcement, 543 U. S. 335, 348 (2005) (“Removal decisions, including the selection of a removed alien’s destination, may implicate [the Nation’s] relations with foreign powers and require consideration of changing political and economic circumstances” (internal quotation marks omitted)); see also Galvan v. Press, 347 U. S. 522, 531 (1954) (“Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ”); Truax v. Raich, 239 U. S. 33, 42 (1915) (“The authority to control immigration—to *410 admit or exclude aliens—is vested solely in the Federal Government”).
In defense of § 6, Arizona notes a federal statute permitting state officers to “cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.” 8 U. S. C. § 1357(g)(10)(B). There may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government. The Department of Homeland Security gives examples of what would constitute cooperation under federal law. These include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities. See Dept,3 of Homeland Security, Guidance on State and Local Governments’ Assistance in Immigration Enforcement and Related Matters 13-14 (2011), online at http://www.dhs.gov/files/resources/immigration.shtm (all Internet materials as visited June 21, 2012, and available in Clerk of Court’s case file). State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody. See § 1357(d). But the unilateral state action to detain authorized by §6 goes far beyond these measures, defeating any need for real cooperation.
Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances. By nonetheless authorizing state and local officers to engage in these enforcement activities as a general matter, § 6 creates an obstacle to the full purposes and objectives of Congress. See Hines, 312 U. S., at 67. Section 6 is pre-empted by federal law.
*411 D

Section 2(B)

Section 2(B) of S. B. 1070 requires state officers to make a “reasonable attempt ... to' determine the immigration status” of any person they stop, detain, or arrest on some other legitimate basis if “reasonable suspicion exists that the person is an alien and is unlawfully present in the United States.” Ariz. Rev. Stat. Ann. § 11-1051(B). The law also provides that “[a]ny person who is arrested shall have the person’s immigration status determined before the person is released.” Ibid. The accepted way to perform these status checks is to contact ICE, which maintains a database of immigration records.
Three limits are built into the state provision. First, a detainee is presumed not to be an alien unlawfully present in the United States if he or she provides a valid Arizona driver’s license or similar identification. Second, officers “may not consider race, color or national origin . . . except to the extent permitted by the United States [and] Arizona Constitution^].” Ibid. Third, the provision must be “implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens.” §11-1051(L).
The United States and its amici contend that, even with these limits, the State’s verification requirements pose an obstacle to the framework Congress put in place. The first concern is the mandatory nature of the status checks. The second is the possibility of prolonged detention while the checks are being performed.
1
Consultation between federal and state officials is an important feature of the immigration system. Congress has made clear that no formal agreement or special training needs to be in place for state officers to “communicate with *412 the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.” 8 U. S. C. § 1357(g)(10)(A). And Congress has obligated ICE to respond to any request made by state officials for verification of a person’s citizenship or immigration status. See § 1373(c); see also § 1226(d)(1)(A) (requiring a system for determining whether individuals arrested for aggravated felonies are aliens). ICE’s Law Enforcement Support Center operates “24 hours a day, seven days a week, 365 days a year” and provides, among other things, “immigration status, identity information and real-time assistance to local, state and federal law enforcement agencies.” ICE, Fact Sheet: Law Enforcement Support Center (May 29, 2012), online at http://www.iee.gov/news/library/factsheets/lesc.htm. LESC responded to more than 1 million requests for information in 2009 alone. App. 93.
The United States argues that making status verification mandatory interferes with the federal immigration scheme. It is true that §2(B) does not allow state officers to consider federal enforcement priorities in deciding whether to contact ICE about someone they have detained. See Brief for United States 47-50. In other words, the officers must make an inquiry even in cases where it seems unlikely that the Attorney General would have the alien removed. This might be the case, for example, when an alien is an elderly veteran with significant and longstanding ties to the community. See 2011 ICE Memorandum 4-5 (mentioning these factors as relevant).
Congress has done nothing to suggest it is inappropriate to communicate with ICE in these situations, however. Indeed, it has encouraged the sharing of information about possible immigration violations. See 8 U. S. C. § 1357(g) (10)(A). A federal statute regulating the public benefits provided to qualified aliens in fact instructs that “no State or local government entity may be prohibited, or in any way *413 restricted, from sending to or receiving from [ICE] information regarding the immigration status, lawful or unlawful, of an alien in the United States.” § 1644. The federal scheme thus leaves room for a policy requiring state officials to contact ICE as a routine matter. Cf. Whiting, 563 U. S., at 609-610 (rejecting argument that federal law pre-empted Arizona’s requirement that employers determine whether employees were eligible to work through the federal E-Verify system where the Federal Government had encouraged its use).
2
Some who support the challenge to §2(B) argue that, in practice, state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status. See, e. g., Brief for Former Arizona Attorney General Terry Goddard et al. as Amici Curiae 37, n. 49. Detaining individuals solely to verify their immigration status would raise constitutional concerns. See, e. g., Arizona v. Johnson, 555 U. S. 323, 333 (2009); Illinois v. Caballes, 543 U. S. 405, 407 (2005) (“A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission”). And it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision. Cf. Part IV-C, supra (concluding that Arizona may not authorize warrantless arrests on. the basis of removability). The program put in place by Congress does not allow state or local officers to adopt this enforcement mechanism.
But § 2(B) could be read to avoid these concerns. To take one example, a person might be stopped for jaywalking in Tucson and be unable to produce identification. The first sentence of §2(B) instructs officers to make a “reasonable” attempt to verify his immigration status with ICE if there is reasonable suspicion that his presence in the United States *414 is unlawful. The state courts may conclude that, unless the person continues to be suspected of some crime for which he may be detained by state officers, it would not be reasonable to prolong the stop for the immigration inquiry. See Reply Brief 12, n. 4 (“[Section 2(B)] does not require the verification be completed during the stop or detention if that is not reasonable or practicable”); cf. Muehler v. Mena, 544 U. S. 93, 101 (2005) (finding no Fourth Amendment violation where questioning about immigration status did not prolong a stop).
To take another example, a person might be held pending release on a charge of driving under the influence of alcohol. As this goes beyond a mere stop, the arrestee (unlike the jaywalker) would appear to be subject to the categorical requirement in the second sentence of § 2(B) that “[a]ny person who is arrested shall have the person’s immigration status determined before [he] is released.” State courts may read this as an instruction to initiate a status check every time someone is arrested, or in some subset of those cases, rather than as a command to hold the person until the check is complete no matter the circumstances. Even if the law is read as an instruction to complete a check while the person is in custody, moreover, it is not clear at this stage and on this record that the verification process would result in prolonged detention.
However the law is interpreted, if §2(B) only requires state officers to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released, the provision likely would survive pre-emption—at least absent some showing that it has other consequences that are adverse to federal law and its objectives. There is no need in this case to address whether reasonable suspicion of illegal entry or another immigration crime would be a legitimate basis for prolonging a detention, or whether this too would be pre-empted by federal law. See, e. g., United States v. Di Re, 332 U. S. 581, 589 (1948) (authority of state officers to make arrests for federal crimes is, absent federal statutory instruction, a matter of state law); Gonzales v. Peo *415 ria, 722 F. 2d 468, 475-476 (CA9 1983) (concluding that Arizona officers have authority to enforce the criminal provisions of federal immigration law), overruled on other grounds in Hodgers-Durgin v. de la Vina, 199 F. 3d 1037 (CA9 1999).
The nature and timing of this case counsel caution in evaluating the validity of §2(B). The Federal Government has brought suit against a sovereign State to challenge the provision even before the law has gone into effect. There is a basic uncertainty about what the law means and how it will be enforced. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume §2(B) will be construed in a way that creates a conflict with federal law. Cf. Fox v. Washington, 236 U. S. 273, 277 (1915) (“So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts” (citation omitted)). As a result, the United States cannot prevail in its current challenge. See Huron Portland Cement Co. v. Detroit, 362 U. S. 440, 446 (1960) (“To hold otherwise would be to ignore the teaching of this Court’s decisions which enjoin seeking out conflicts between state and federal regulation where none clearly exists”). This opinion does not foreclose other pre-emption and constitutional challenges to the law as interpreted and applied after it goes into effect.
V
Immigration policy shapes the destiny of the Nation. On May 24, 2012, at one of this Nation’s most distinguished museums of history, a dozen immigrants stood before the tattered flag that inspired Francis Scott Key to write the National Anthem. There they took the oath to become American citizens. The Smithsonian, News Release, Smithsonian Citizenship Ceremony Welcomes a Dozen New Americans (May 24, 2012), online at http://newsdesk.si.edu/ releases. These naturalization ceremonies bring together *416 men and women of different origins who now share a common destiny. They swear a common oath to renounce fidelity to foreign princes, to defend the Constitution, and to bear arms on behalf of the country when required by law. 8 CFR § 837.1(a). The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here.
The National Government has significant power to regulate immigration. With power comes responsibility, and the sound exercise of national power over immigration depends on the Nation’s meeting its responsibility to base its laws on a political will informed by searching, thoughtful, rational civic discourse. Arizona may have understandable frustrations with the problems caused by illegal immigration while that process continues, but the State may not pursue policies that undermine federal law.
* * *
The United States has established that §§3, 5(C), and 6 of S. B. 1070 are pre-empted. It was improper, however, to enjoin §2(B) before the state courts had an opportunity to construe it and without some showing that enforcement of the provision in fact conflicts with federal immigration law and its objectives.
The judgment of the Court of Appeals for the Ninth Circuit is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Justice Kagan took no part in the consideration or decision of this case.