**UNITED STATES of America, Plaintiff,**

**v.**

**State of SOUTH CAROLINA and Nikki R. Haley, in her official capacity as the Governor of South Carolina, Defendants.**

**Lowcountry Immigration Coalition, et al., Plaintiffs,**

**v.**

**Nikki R. Haley, in her official capacity as the Governor of South Carolina, et al., Defendants.**

**Civil Action Nos. 2:11–2958, 2:11–2779.**

United States District Court, D. South Carolina, Charleston Division.

Nov. 15, 2012.

---

William Norman Nettles, Barbara Murcier Bowens, US Attorneys Office, Columbia, SC, Arthur Robert Goldberg, William Scott Simpson, US Department of Justice, Washington, DC, for Plaintiffs.

James Emory Smith, Jr., Robert DeWayne Cook, SC Attorney General's Office, Columbia, SC, for Defendants.

## ORDER

RICHARD MARK GERGEL, District Judge.

This matter comes before the Court pursuant to a limited remand from the United States Court of Appeals for the Fourth Circuit on August 16, 2012 to allow this Court to reexamine its preliminary injunction issued on December 22, 2011 in light of the United States Supreme Court's opinion in *Arizona v. United States*, — U.S. —, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (hereinafter "*Arizona* decision"), issued on June 25, 2012. (Dkt. No. 98).[1] This limited remand followed this Court's "indicative ruling," issued pursuant to Federal Rule of Civil Procedure 62.1 on July 9, 2012, that the United States Supreme Court's *Arizona* decision raised "substantial issues" regarding at least a portion of this Court's earlier decision. (Dkt. No. 92). Upon the grant of the limited remand, this Court established a briefing schedule and set oral argument for November 13, 2012. (Dkt. No. 102). After a careful consideration of the relevant precedents, including the *Arizona* decision, the full record before the Court, and the written and oral arguments of all parties to these actions, the Court hereby modifies its earlier order in regard to portions of Section 6 of S.C. Act No. 69 (hereinafter "Act 69") and leaves in place the grant of preliminary injunctive relief regarding Sections 4(A), (B), (C) and (D), 5, and 6(B)(2) of Act 69, as further set forth below.

## Background

The South Carolina General Assembly formally adopted a comprehensive state immigration statute, Act 69, on June 27, 2011. A number of individuals and advocacy groups (hereinafter collectively "private Plaintiffs") filed suit on October 12, 2011 challenging Act 69 in its entirety as well as specific portions of the Act and requesting preliminary and permanent injunctive relief. (C.A. No. 2:11–2779, Dkt. No. 1). Thereafter, the United States filed a separate action on October 31, 2011 challenging the validity of Sections 4, 5, 6 and 15 of Act 69 and requesting preliminary and permanent injunctive relief. (Dkt. No. 1). Because Act 69 was set to take effect on January 1, 2012, the Court set an expedited briefing schedule on November 1, 2011 and scheduled oral argument on December 19, 2011. The Court issued an order on December 22, 2011 preliminarily enjoining Sections 4(A), (B), (C), and (D), 5, and 6 of Act 69. *United States v. South Carolina*, 840 F.Supp.2d 898 (D.S.C.2011). As referenced above, this Court now reviews this preliminary injunction in light of the *Arizona* decision.

## Discussion

The above captioned parties have, somewhat predictably, taken different views on the issues before the Court in this limited remand. The state Defendants[2] assert that the Court should dissolve the preliminary injunction in its entirety despite the United States Supreme Court affirming significant portions of the Arizona district court and Ninth Circuit opinions that declared multiple and, in many instances, similar provisions of Arizona's immigration statute unconstitutional. (Dkt. Nos. 105, 110, 113). The private Plaintiffs urge the Court to maintain the previously issued preliminary injunction, including the section enjoining immigration inquiries for persons lawfully stopped or detained for

---

1. All citations to the case docket will be to C.A. No. 2:11–2958 unless specifically indicated otherwise.

2. The term "state Defendants" refers collectively to the named defendants in the two above captioned actions.

other reasons, notwithstanding the fact that the *Arizona* decision reversed lower court decisions enjoining a similar provision of the Arizona statute. (Dkt. No. 106; C.A. No. 2:11–2779, Dkt. Nos. 154, 158). The United States asserts that, in light of the *Arizona* decision, this Court should dissolve that portion of the preliminary injunction relating to immigration inquiries for persons lawfully stopped or detained and, in all other respects, maintain the Court's previously granted preliminary injunctive relief. (Dkt. Nos. 107, 111). The Court will address each relevant section of Act 69 below.

### A. Sections 4(B) and (D)

Sections 4(B) and (D) of Act 69 established two new state criminal provisions relating to persons who knowingly or recklessly participate in the transporting or sheltering of persons in furtherance of an unlawfully present person's entry into the United States or to avoid detection of such a person's unlawful presence. These newly adopted state provisions are similar to existing provisions of federal law. *See* 8 U.S.C. §§ 1324(1)(a)(ii), (iii). The federal law authorizes state and local law enforcement officials to make arrests under the federal statute but prosecution remains exclusively within the discretion of the federal government. *Id.* § 1324(c). This Court enjoined Sections 4(B) and (D) of Act 69, stating that this was a "classic case of field preemption" because Congress had "adopted a scheme of federal regulation regarding the harboring and transporting of unlawfully present persons so pervasive that it left no room in this area for the state to supplement it." *United States v. South Carolina,* 840 F.Supp.2d at 916–17.

The state Defendants now argue that the *Arizona* decision did not specifically address this issue and point out that the Arizona district court had earlier refused to enjoin a provision similar to Sections 4(B) and (D). (Dkt. No. 105 at 9). Though the state Defendants are correct that the United States Supreme Court did not address similar harboring and sheltering provisions in its *Arizona* decision, they fail to appreciate that this is because the issue was not raised on appeal. In fact, there is little in the *Arizona* decision that gives support to the state Defendants' argument.

In examining Section 3 of the Arizona statute, relating to a new state misdemeanor for failing to carry an alien registration card, the Supreme Court noted that there was overlap with a comprehensive federal regulatory scheme concerning the documentation requirements of alien persons within the United States. *Arizona v. United States,* 132 S.Ct. at 2501–03. The Supreme Court, in declaring the Arizona statute preempted, noted that "[p]ermitting the State to impose its own penalties for the federal offenses here would create conflict with the careful framework Congress adopted." *Id.* at 2502.

In addition, in two post-*Arizona* decisions the Eleventh Circuit enjoined similar transporting and sheltering provisions found in the Alabama and Georgia statutes. *See Ga. Latino Alliance for Human Rights v. Georgia,* 691 F.3d 1250, 1263–67 (11th Cir.2012) (hereinafter *"GLAHR"*); *United States v. Alabama,* 691 F.3d 1269, 1285–88 (11th Cir.2012). The Eleventh Circuit in *GLAHR* found that the federal criminal provisions relating to harboring and transporting unlawfully present persons were "comprehensive" and that the "breadth of these laws illustrates an overwhelming dominant federal interest in the field." 691 F.3d at 1264. The *GLAHR* court further found that Georgia's harboring and sheltering statute "threaten[ed] the uniform application" of federal immi-

gration law and challenged "federal supremacy in the realm of immigration." *Id.* at 1265–66. Based on that reasoning, the Eleventh Circuit found the Georgia statutory provision preempted by federal law, *id.* at 1267, as well as the Alabama provision in the companion case, *United States v. Alabama,* 691 F.3d at 1290.

Further, the Arizona district court recently revisited the sheltering and harboring provisions of the Arizona statute in a new suit brought by private litigants. *See Valle del Sol v. Whiting,* No. 10–1061 (D.Ariz. Sept. 5, 2012) (order granting preliminary injunction).[3] The Arizona district court, though it had twice rejected arguments invalidating the harboring and sheltering provisions of the Arizona immigration statute, relied heavily on the analysis contained in the Eleventh Circuit's decisions in *GLAHR* and *United States v. Alabama* and ultimately concluded that the Arizona statute was field and conflict preempted. (Dkt. No. 105–1 at 8).

■ This Court, having carefully considered the arguments of all parties and the recent case law on this issue, continues to find that Sections 4(B) and (D) infringe upon a comprehensive federal statutory scheme and would interfere with the federal government's supremacy in the realm of immigration. Further, the South Carolina statutory provisions would allow state officials to exercise discretion regarding the prosecution of persons allegedly harboring or sheltering persons unlawfully present in the United States, creating a conflict with federal law since that discretion has previously been the exclusive province of the federal government. Consequently, the Court leaves in place its preliminary injunction regarding Sections 4(B) and (D) of Act 69.

## B. Sections 4(A) and (C)

■ Sections 4(A) and (C) make it a state criminal offense for persons unlawfully present in the United States "to allow themselves to be transported" or to "conceal, harbor or shelter themselves from detection." In granting the Plaintiffs' motions for preliminary injunction, this Court found that these provisions, which apparently have no counterpart in state or federal law, were the functional equivalent of making unlawful presence a criminal offense. *United States v. South Carolina,* 840 F.Supp.2d at 919. This Court concluded that these provisions were field and conflict preempted because they "seek to criminalize what Congress has chosen to treat only as a civil offense." *Id.*

The state Defendants assert that since no other state has "self harboring provisions," and consequently no other court has addressed the validity of such statutes, this Court should dissolve its injunction. (Dkt. No. 105 at 10). This Court finds that argument unpersuasive. The *Arizona* decision only served to underscore that, in a realm where Congress has enacted a comprehensive framework for addressing a national issue and judged that a particular activity is best enforced as a civil matter, any effort by a State to criminalize that activity creates a "conflict in the method of enforcement" that stands as "an obstacle to the regulatory system Congress chose" and is, therefore, "preempted by federal law." *See Arizona v. United States,* 132 S.Ct. at 2505 (concluding that a State effort to criminalize seeking or engaging in unauthorized employment is preempted by a federal statute that instead imposes civil penalties on employees).

Sections 4(A) and (C) represent just such an effort to criminalize an activity that is, under federal law, deemed a civil

---

**3.** This decision is apparently not currently published but can be found at Dkt. No. 105–1.

violation. The provisions place criminal sanctions on the sheltering and transporting of one's self—activities that are, practically speaking, unavoidable. In effect, Sections 4(A) and (C) criminalize removable aliens' presence in the State, and do so despite the Supreme Court's affirmation in *Arizona* that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Id.* As a result, like Arizona's attempt to criminalize unauthorized work after Congress had judged it a civil matter, Sections 4(A) and (C) necessarily conflict with federal policy judgments relating to removability, and are therefore preempted by federal law.

This Court continues to find South Carolina's "self harboring" statute as conflicting with a well ordered and settled federal statutory scheme for dealing with unlawfully present persons and that it is preempted by federal law. Thus, the Court finds no basis to alter its preliminary injunction regarding Sections 4(A) and (C).

## C. Sections 5 and 6(B)(2)

█ Section 5 of Act 69 makes it a state misdemeanor for a person eighteen years or older not to carry an alien registration card issued pursuant to 8 U.S.C. § 1304. Section 6(B)(2) of Act 69 makes it unlawful for any person to possess "false, fictitious, fraudulent or counterfeit identification" for purposes of offering proof of one's lawful presence in the United States. This Court previously enjoined these provisions because, given that "the national government has adopted a pervasive and comprehensive scheme that leaves no place for state regulation in this area," it is clear that "alien registration is a field under the exclusive control of the federal government." *United States v. South Carolina,* 840 F.Supp.2d at 917–18.

In the *Arizona* case, the Supreme Court confronted a new state misdemeanor statute that prohibited "willful failure to complete or carry an alien registration document ... in violation of 8 United States Code section 1304(e) or 1306(a)." Ariz. Rev.Stat. Ann. § 13–1509(A). Affirming that the "States may not enter, in any respect, an area the Federal Government has reserved for itself," and observing in particular that "[f]ederal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders," the Supreme Court concluded that, in regard to alien registration, "[p]ermitting the State to impose its own penalties for the federal offenses would conflict with the careful framework Congress adopted." *Arizona v. United States,* 132 S.Ct. at 2502. Notably, like this Court in its earlier order in this case, the Supreme Court in *Arizona* recognized that preemption here is necessary and comprehensive because the federal scheme for alien registration "touches on foreign relations." *Id.* The Court therefore found the provision preempted.

Despite the Supreme Court's unequivocal statement that alien registration is a field preempted by federal law, the state Defendants continue to assert that this Court should dissolve its injunction regarding Sections 5 and 6(B)(2). (Dkt. No. 105 at 11–12). This Court sees nothing in the *Arizona* decision that would call for dissolving this portion of the injunction, and indeed views *Arizona* as precedent supporting the decision to keep the injunction in place. The Court continues to find that the area of alien registration is field preempted from state regulation and leaves undisturbed its preliminary injunction regarding Sections 5 and 6(B)(2) of Act 69.

### D. Sections 6(A), (B)(1), (C)(1)–(3), and (D)

■ Section 6(A) of Act 69 mandates that a state or local law enforcement officer who lawfully stops a person for a criminal offense and has a "reasonable suspicion" that "the person is unlawfully present in the United States" must make a "reasonable effort" to determine that person's immigration status. Section 6(B)(1) allows the use of certain official picture identifications to create a presumption of a person's lawful presence. If the person under suspicion does not possess one of the designated forms of identification, the officer must make a "reasonable effort, when practicable, to verify the person's lawful presence." S.C. Act 69, § 6(C)(1). This can include inquiries to federal immigration officials or a newly created state immigration enforcement unit. *Id.* The statute goes on to provide that any stop or detention may not be longer than "a reasonable amount of time as allowed by law" and must be consistent with federal immigration law and the United States Constitution. *Id.* §§ 6(C)(2), (D).

The Supreme Court addressed a similar provision in the Arizona statute, Section 2(B), and expressed concerns regarding the possible detention or holding of persons simply to verify their immigration status. The Supreme Court noted that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." *Arizona v. United States,* 132 S.Ct. at 2509. Further, the Supreme Court observed that "it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." *Id.* The Supreme Court went on to hold, however, that if the Arizona statute "only requires state officers to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released, the provision likely would survive preemption—at least absent some showing that it has other consequences that are adverse to federal law and its objectives." *Id.*

Thus, though it recognized significant limitations on the authority of the State to detain a person suspected of being unlawfully present in the United States, the Supreme Court found that it was possible that the Arizona statute might be interpreted by the state courts "to avoid these concerns." *Id.* The Court explained that, where "[t]here is a basic uncertainty about what the law means and how it will be enforced," it would be "inappropriate to assume [the provision] will be construed in a way that creates a conflict with federal law." *Id.* at 2510. As a result, the Supreme Court held that enjoining the Arizona statute on the basis of a facial challenge was not proper, though the Court made a point not to "foreclose other preemption and constitutional challenges to the law as interpreted and applied after it goes into effect." *Id.*

This Court earlier enjoined the immigration inquiry provisions of Section 6, holding at the time that such inquiries potentially burdened and disrupted "finite and limited federal immigration enforcement resources" and interfered with federal control over matters potentially affecting the foreign affairs of the United States. *United States v. South Carolina,* 840 F.Supp.2d at 924. Courts reviewing the constitutionality of the Arizona and Georgia immigration statutes reached similar conclusions. *See United States v. Arizona,* 703 F.Supp.2d 980, 993–98 (D.Ariz.2010), *aff'd,* 641 F.3d 339, 348–54 (9th Cir.2011); *GLAHR v. Deal,* 793 F.Supp.2d 1317, 1330–33 (N.D.Ga.2011). *But see United States v.*

*Alabama,* 813 F.Supp.2d 1282, 1318–29 (N.D.Ala.2011).

The Supreme Court in the *Arizona* decision concluded otherwise. In doing so, the Court observed that the requesting of immigration status information by state and local officials from the federal government was explicitly authorized under federal law and "[i]ndeed, [Congress] has encouraged the sharing of information about possible immigration violations." *Arizona v. United States,* 132 S.Ct. at 2508. Thus, the Supreme Court concluded that the "federal scheme ... leaves room for a policy requiring state officials to contact ICE as a routine matter." *Id.*

The private Plaintiffs argue that Sections 6(A) and 6(C)(1) will inevitably lead to the detention of persons solely to verify their immigration status. They make this argument on the premise that the time necessary to conduct an immigration status inquiry will routinely exceed the time reasonably necessary to complete the law enforcement work associated with the original purpose of a stop or detention. (Dkt. No. 106 at 15–18). The *Arizona* decision leaves little doubt that, should such detentions occur, they would raise constitutional concerns. 132 S.Ct. at 2509; *see also Arizona v. Johnson,* 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

The state Defendants argue, as did the defendants in *Arizona,* that the immigration inquiry statute can be interpreted to avoid such unconstitutional detentions. For example, the *Arizona* decision noted that, simply because the state statute mandated the initiation of an immigration inquiry, it did not require that the inquiry be completed while the person under suspicion is being stopped or detained. 132 S.Ct. at 2509. Further, Section 6(C)(2) provides that a person may be detained "only for a reasonable amount of time as allowed by law" and that, if the person's immigration status cannot be determined in such time, "the officer may not further ... detain ... the person solely on the person's lawful presence in the United States." Additionally, Section 6(D) provides that Section 6 must be construed consistently with federal immigration law and the United States Constitution.

Applying the holding of the *Arizona* decision to the status-checking provisions of Act 69, in particular Sections 6(A), (B)(1), (C)(1)–(3), and (D), this Court concludes that an injunction at this stage of the litigation is not appropriate, and hereby dissolves its preliminary injunction regarding these provisions. This litigation is only at the preliminary injunction stage, and this Court's decision to dissolve the injunction regarding these status-checking provisions does not foreclose a future as-applied challenge based upon subsequent factual and legal developments. In the course of this litigation, the parties will have the opportunity to conduct discovery regarding the actual practices and procedures associated with the implementation of Sections 6(A) and 6(C)(1), and this Court can then address these issues with the benefit of a full record.[4]

---

4. For example, the Court is aware from an

affidavit filed by an official with the Law

## E. Section 6(C)(4)

██ Section 6(C)(4) of Act 69 provides that, if a state or local law enforcement officer determines that a person is unlawfully present in the United States, the officer "shall determine in cooperation with" state and federal immigration officials whether the officer will retain custody relating to the criminal offense which led to the initial stop or detention or whether state or federal immigration agencies "shall assume custody of the person." The subsection goes on to provide that the "officer may securely transport the person to a federal facility in this State or to any other point of transfer into federal custody that is outside of the officer's jurisdiction," provided that the officer must obtain judicial authorization if the transporting of the person to federal custody is outside of South Carolina.

In granting a preliminary injunction enjoining enforcement of this subsection, this Court interpreted the statutory language as authorizing state and local law enforcement officials to deliver persons determined to be unlawfully present in the United States to any federal facility without federal authorization. *United States v. South Carolina*, 840 F.Supp.2d at 923. Following the clear and unequivocal language of the *Arizona* decision that the State "holding aliens in custody for possible unlawful presence without federal direction and supervision" would "disrupt the federal framework," *Arizona v. United States*, 132 S.Ct. at 2509, the state Defendants now assert that Section 6(C)(4) "is not interpreted by [the state Defendants] or the Department of Public Safety to permit the detention of individuals based on immigration status pending and during transfer unless authorized by federal officials." (Dkt. No. 113 at 3–4).[5]

This Court is mindful of the Supreme Court's admonition in the *Arizona* decision that it should exercise restraint in granting preliminary injunctive relief as a result of a facial challenge where there is "basic uncertainty about what the law means and how it will be enforced." *Arizona v. United States*, 132 S.Ct. at 2510. Further, the *Arizona* Court noted that the State had placed certain "limits" on its law, including providing that the law would be "implemented in a manner consistent with federal law regarding immigration, protecting civil rights of all persons and respecting the privileges and immunities of United States citizens." *Id.* at 2508.

South Carolina included nearly identical limiting language in its immigration stat-

---

Enforcement Support Center, which administers the immigration status inquiry program, that the time necessary to initiate and complete an immigration inquiry is estimated to take on average 81 minutes. (Dkt. No. 16–7 at 10, 12–13). A detention of a person suspected of being unlawfully present in the United States for this period of time simply to determine immigration status would raise constitutional concerns. *See United States v. Place*, 462 U.S. 696, 709–10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("[A]lthough we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the person for the prolonged 90–minute period involved here ...."); *United States v. McFarley*, 991 F.2d 1188, 1193–94 (4th Cir.1993) ("[W]e hold that

38 minutes is not *per se* an unreasonably long time period in which to conduct that limited investigation."). A legitimate line of inquiry in discovery would be whether law enforcement officers, in circumstances where the work associated with the original purpose of the stop or detention has been completed, terminate or prolong the detention while awaiting the completion of the immigration status inquiry.

**5.** The state Defendants have filed an affidavit executed by the commander of the newly created Immigration Enforcement Unit at the South Carolina Department of Public Safety to provide factual support for this statement. (Dkt. No. 115).

ute at Section 6(D). Interpreting the whole of Section 6 in light of the restrictions on state authority set forth in *Arizona*, and considering the new and unequivocal statement of the State that it cannot detain or transport to a federal facility any person for alleged unlawful presence without express federal supervision and authorization, the Court recognizes the possibility that Section 6(C)(4) can be interpreted and enforced in a manner consistent with federal law. Therefore, the Court finds that, at this stage of the litigation, it is appropriate to dissolve the injunction as to Section 6(C)(4). This action does not, however, foreclose a later as-applied challenge to this provision should the law be implemented in a manner inconsistent with federal law.

## F. Section 7(E)

The private Plaintiffs urge the Court to consider enjoining Section 7(E) of Act 69 because it mandates that, upon the completion of any "sentence of incarceration" by a person unlawfully present in the United States, the jailer "shall securely transport the prisoner to a federal facility." (Dkt. No. 106 at 22). The private Plaintiffs argue that this provision undermines federal control over immigration and raises significant Fourth Amendment issues. (*Id.* at 23–24). They also correctly note that the Court previously declined to address the Section 7 issues because the granting of the preliminary injunction regarding Sections 4, 5, and 6 largely eliminated the risk of being adversely affected by Section 7. The private Plaintiffs contend that, should the Court dissolve any portion of the previously issued injunction,

it should revisit the issue of whether an injunction is appropriate regarding Section 7 of the Act. The state Defendants assert that consideration of an injunction regarding Section 7 goes beyond the scope of the limited remand granted by the Fourth Circuit. (Dkt. No. 113 at 11).

■ While the Court is not persuaded that consideration of Section 7(E) is beyond the scope of the limited remand, the Court concludes that the private Plaintiffs have significant standing problems associated with a challenge to this particular provision. For a party to satisfy the threshold question of standing, the party must demonstrate that it is under threat of suffering an injury in fact that is "concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). Though a plaintiff who seeks preventive relief while challenging a statute need not await actual injury to have standing, that plaintiff must nonetheless face a realistic danger of sustaining a direct injury through the application of that statute. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979).

■ Although some of the private Plaintiffs may be unlawfully present in the United States, none has pleaded a realistic danger of sustaining injury through the application of Section 7(E). Section 7(E) potentially impacts persons who have been arrested, tried, convicted, incarcerated and are then expecting release following the completion of their sentence.[6] The threat

---

6. In this way, standing to challenge Section 7(E) differs from cases in which plaintiffs facing a threat of prosecution have standing to challenge a criminal statute. *See, e.g., Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *Steffel*

*v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

The plaintiffs in those cases were directly injured because their conduct, which they alleged was constitutionally protected, was chilled by the threat of prosecution. In con-

of injury resulting from the application of Section 7(E) only faces individuals who, it can be expected, will at some point be released from incarceration. None of the private Plaintiffs claims to have been arrested, let alone to be currently incarcerated. As a result, the Court finds that the potential injury to any of the private Plaintiffs is too remote, contingent, and speculative at this time to satisfy Article III standing requirements regarding Section 7(E).

### Conclusion

Based upon the foregoing, the Court hereby dissolves the preliminary injunction regarding Section 6 of Act 69, except as to Section 6(B)(2), and leaves in place all other aspects of the preliminary injunction issued on December 22, 2011.

**AND IT IS SO ORDERED.**

trast, here, the private Plaintiffs do not claim any such direct injury; rather, they allege an injury that may or may not come to pass, depending on, among other things, whether they are subsequently convicted of, and incarcerated for, some unspecified crime.