FISHER, Circuit Judge,
dissenting:
Due process guarantees that individuals arrested for a crime are entitled to bail pending determination of their guilt or innocence, with some limited exceptions. Arizona, however, has decided to deny pretrial bail to all persons arrested for a range of felony crimes who are in the United States without authorization, theorizing they are likely to flee the country solely because of their immigration status. Without any evidence that unauthorized immigrants released on bail have been or are less likely to appear for-trial compared to arrestees who are lawful residents, the majority accepts Arizona’s unsupported assertion that all unauthorized immigrants necessarily pose an unmanageable flight risk, such that a blanket denial of bail is not an “excessive” tool to combat flight risk. As revealed by Proposition 100’s legislative history and scope, however, Arizona is plainly using the denial of bail as a method to punish “illegal” immigrants, rather than simply as a tool to help manage arrestees’ flight risk. “It is axiomatic that ‘due process requires that a pretrial detainee not be punished.’ ” Schall v. Martin, 467 U.S. 253, 269, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (alteration omitted) (quoting Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Because this bail-denial scheme contravenes the Constitution’s fundamental prohibition on punishment before determination of guilt in a criminal trial, I dissent.
I. SUBSTANTIVE DUE PROCESS
Proposition 100 categorically denies bail and thus requires pretrial detention for *1074 every undocumented immigrant charged with any of a broad range of felonies, regardless of the seriousness of the offense or the individual circumstances of the defendant, including the defendant’s strong ties to and deep roots in the community. The state maintains — and the majority holds — that this unique, sweeping pretrial detention statute, directed solely at undocumented immigrants, comports with substantive due process because it has a permissible purpose and is reasonably related to the state’s interest in preventing pretrial flight. I respectfully disagree.
Under United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), a restriction on bail violates substantive due process, if it either (1) has a punitive purpose or (2) imposes an excessive restriction on liberty in relation to a permissible regulatory purpose.
To determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent. Unless [the legislature] expressly intended to impose punitive restrictions, the punitive/regulatory distinction turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.
Id. at 747, 107 S.Ct. 2095 (citation, alterations and internal quotation marks omitted). Although preventing flight risk is a permissible regulatory purpose, see id. at 749, 107 S.Ct. 2095; Bell, 441 U.S. at 536, 99 S.Ct. 1861, Arizona’s indiscriminate pretrial detention law is unconstitutionally punitive under both prongs of Salerno. I address each in turn.
A. Legislative Purpose
First, the record plainly shows that lawmakers designed Proposition 100 — at least in large part — to punish undocumented immigrants for being in the United States unlawfully:
• State Representative Russell Pearce, the bill’s sponsor, stated that Proposition 100
just simply bridges the gap, a loophole in the law that would allow people who are not in this country [jlegally who have no business to be released if they commit any crime, they have no business being released if they commit no crime, no additional crime [be]cause they’re already in this country illegally.
Senate Judiciary Committee Meeting on H.B. 2389, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005). Notably, and contrary to Pearce’s suggestion, being “in this country illegally” is not a crime. See Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2505, 183 L.Ed.2d 351 (2012).
• Rep. Pearce promoted the bill on the ground that “all illegal aliens in this country ought to be detained, debriefed and deported.” Id. He reiterated: “If you’re in this country illegally you ought to be detained [and] deported[.] [E]nd of story,” and defended the bill as a “reasonable approach” to border security.[1] Id.
*1075 • State Representative Ray Barnes expressly promoted the bill on the (again, erroneous) assumption that “the mere fact that they’re here undocumented [means] that the crime has already been committed.” House Judiciary Committee Meeting on H.B. 2389, Jan. 27, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005).
• State Senator Jack Harper said, “what part of illegal don’t we understand? Illegal aliens shouldn’t be able to get bond for anything.” Senate Judiciary Committee Meeting on H.B. 2389, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005).
• In a hearing on a bill to implement Proposition 100 after its passage, State Representative John Kavanagh said: “I’m amazed that we provide bail to anybody who’s arrested for a crime that’s an illegal alien.... I therefore support this bill as a first step to what we should be really doing and that’s deporting anybody here illegally.” House Floor Meeting on S.B. 1265, June 13, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007).
The majority correctly observes that some statements in the legislative record refer to flight risk rather than punishment. Fairly viewed, however, the legislative record as a whole clearly shows that legislators were motivated at least in large part by an overriding desire to punish undocumented immigrants for being in the country unlawfully — i.e., that lawmakers “intended to impose punitive restrictions” on undocumented immigrants. Salerno, 481 U.S. at 747, 107 S.Ct. 2095.[2] The plaintiffs therefore have established a due process violation under Salerno’s first prong.[3]
B. Excessiveness
Even if Proposition 100 were enacted for the regulatory purpose of managing flight risk, it would still violate substantive due process under Salerno’s second prong, because it restricts substantially more liberty *1076 than necessary to achieve the state’s legitimate interest. See Salerno, 481 U.S. at 747, 107 S.Ct. 2095. The state’s premise that immigration status and flight risk are closely linked is unsubstantiated. Furthermore, even if there is some link, the state’s blanket denial of bail is an excessive and overbroad tool to prevent flight risk.
To conduct a meaningful excessiveness analysis, we must compare the magnitude of the societal problem being addressed against the severity of the chosen remedy. The societal ill Proposition 100 targets is not flight risk generally, but rather the increased flight risk supposedly posed by undocumented immigrants, the only individuals the proposition covers.[4] The defendants have failed to establish that this societal problem exists, much less demonstrate its magnitude.
Unlike the defendants in Salerno and Demore v. Kim, 538 U.S. 510, 128 S.Ct. 1708, 155 L.Ed.2d 724 (2003) — who presented data to back up their claims that the bail schemes under review addressed “a particularly acute problem,” Salerno, 481 U.S. at 750, 107 S.Ct. 2095; see also Demore, 538 U.S. at 518-20, 123 S.Ct. 1708 — the defendants here have failed to present any findings, studies, statistics or other evidence showing that undocumented immigrants actually posed a significantly greater flight risk than lawful residents before implementation of Proposition 100.[5] Despite the lack of any supporting data, Arizona, the district court and the majority have all assumed that undocumented immigrants pose a greater flight risk than other arrestees. When the chosen remedy is so draconian as to categorically deny bail to anyone who is probably an undocumented immigrant, the justification should be demonstrated factually, rather than supported by only unsubstantiated assumptions and anecdotes. If undocumented immigrants actually demonstrated a substantially greater flight risk before Proposition 100, defendants had five years *1077 to gather and present data to back up such a claim. They have presented nothing of the sort to support their assertion that Proposition 100 addresses “a pressing societal problem.” Salerno, 481 U.S. at 747, 107 S.Ct. 2095.
On the other side of the scale from the state’s interest in ensuring appearance at trial is a profound infringement on liberty interests: automatic detention in jail without the possibility of bail, simply based on an arrestee’s presumed status as an undocumented immigrant. Such a denial of bail implicates “a basic and significant liberty interest in not being confined pending trial.” United States v. Motamedi, 767 F.2d 1403, 1414 (9th Cir.1985) (Boochever, J., concurring in part and dissenting in part). “The consequences of prolonged [pretrial] detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect’s job, interrupt his source of income, and impair his family relationships.” Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). “Pretrial detention may hamper the preparation of a defense by limiting the defendant’s access to his attorney and to potential witnesses for the defense.” Motamedi, 767 F.2d at 1414 (Boochever, J., concurring in part and dissenting in part) (citing Stack v. Boyle, 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951)).
Even if the defendants could show that undocumented immigrants pose a greater flight risk on average than lawful residents, Proposition 100 is fatally flawed because it uses the disfavored mechanism of an irrebuttable presumption, rather than an individualized hearing, to determine whether an arrestee is an unmanageable flight risk. In Salerno, the regulatory scheme was limited to arrestees who actually posed a danger to the community. First, it was limited to “individuals who have been arrested for a specific category of extremely serious offenses” — who Congress found were “far more likely to be responsible for dangerous acts in the community after arrest.” Salerno, 481 U.S. at 750, 107 S.Ct. 2095. Second, even for arrestees falling within that specific category, the scheme provided case-by-case determinations of the need for pretrial detention. Each arrestee was entitled to a “full-blown adversary hearing,” at which the government was required to prove by “clear and convincing evidence” that the individual presented “a demonstrable danger to the community” and that “no conditions of release c[ould] reasonably assure the safety of the community.” Id. It was only “[u]nder these narrow circumstances” that the Court held that society’s interest was sufficient to outweigh the “individual’s strong interest in [pretrial] liberty.” Id.
In contrast, Proposition 100 is not narrowly focused on those arrestees who actually pose the greatest flight risk. Plainly, some undocumented immigrants do not pose unmanageable flight risks. The record includes examples of undocumented immigrants who were arrested before Proposition 100, granted bail and appeared at their court dates and trials. Yet even these individuals were needlessly remanded into state custody following Proposition 100’s passage.[6] Proposition 100 eliminates *1078 the opportunity for comparable arrestees to show that, notwithstanding their immigration status, they do not pose a flight risk.[7]
The Arizona legislature surmised that undocumented immigrants pose a greater flight risk than lawful residents because they supposedly lack strong ties to the community and have a “home” in another country to which they can flee, but this ignores those undocumented immigrants who have strong ties to their community and no home abroad. Many undocumented immigrants, for example, have “children born in the United States” and “long ties to the community.” Arizona v. United States, 132 S.Ct. at 2499.[8] Moreover, although the defendants consistently refer to undocumented immigrant arres-tees as “flight risks,” the pertinent inquiry is whether the arrestee is an unmanageable flight risk. There are a variety of methods to manage flight risk, such as bond requirements, monitoring and reporting requirements. See, e.g., Ariz.Rev.Stat. § 13-3967(D). Proposition 100 ignores these tools for managing flight risk, instead mandating incarceration in every case.
The Constitution disfavors irrebuttable presumptions like Proposition 100’s categorical denial of bail. See Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 645-46, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Vlandis v. Kline, 412 U.S. 441, 446, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), an unwed father’s children were removed by the state after the children’s mother died, based on the state’s use of a conclusive presumption that unwed fathers were unsuitable, neglectful parents. See id. at 646-47, 92 S.Ct. 1208. The Court acknowledged that “[i]t may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents,” but it noted that even if true on average, there were exceptions: “all unmarried fathers are not in this category; some are wholly suited to have custody of their children.” Id. at 654, 92 S.Ct. 1208. So too here. Even assuming undocumented immigrants pose a greater flight risk on average (not established, as discussed above), some by definition do not. Proposition 100 therefore results in far more arrestees being denied bail than necessary, making it plainly excessive in relation to its stated purpose.
*1079 Contrary to the majority’s assertion, categorical denials of bail for non-capital crimes are rare.[9] The majority identifies only eight states that categorically deny bail for crimes punishable by life in prison. Maj. Op. at 1062. Whether even these laws are constitutional is hardly a settled question, having never been declared such by the Supreme Court or a federal appellate court. But even these eight states do not go as far as Arizona. The majority identifies only one other state that categorically denies bail to undocumented immigrant arrestees.[10]
Even before Proposition 100, Arizona went further than most states in restricting bail, categorically denying bail not only to those arrested for capital crimes or crimes subject to life in prison, but also to those arrested for certain sexual crimes not subject to life imprisonment. Maj. Op. at 1063 (citing Ariz. Const, art. II, § 22). The majority takes comfort in Arizona’s expansive use of categorical denial of bail, saying “Proposition 100 is nothing more than an extension of Arizona’s existing pretrial detention scheme.” Maj. Op. at 1063. The more appropriate reaction would be that Proposition 100, which is a major expansion of categorical bail denial, reflects a serious devaluation of the presumption of innocence and the constitutional principle that arrestees may not be punished before judgment of guilt.
In sum, Proposition 100 is excessive in relation to its stated legitimate purpose for two independent reasons. First, it purports to deal with a societal ill that has not been shown to exist at all. Second, even if we assume that undocumented immigrants pose a greater flight risk on average than lawful residents, Proposition 100 is fatally flawed because it uses the disfavored mechanism of an irrebuttable presumption, rather than an individualized hearing, to determine whether an arrestee is an unmanageable flight risk. This mechanism necessarily results in the deprivation of far more liberty than necessary to ensure appearance at trial, because even undocumented immigrants who do not pose a flight risk or who pose a manageable one will be categorically denied bail based on their status alone. Proposition 100 fails Salerno’s second prong and facially violates substantive due process.
II. REMAINING CLAIMS
Because I conclude that Proposition 100 on its face violates substantive due process, I do not address the plaintiffs’ procedural due process, Eighth Amendment, Supremacy Clause and as-applied claims, though some of them appear meritorious.
III. CONCLUSION
“Procedure by presumption is always cheaper and easier than individualized de *1080 termination. But when, as here, the procedure forecloses the determinative issues ..., when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests” of the person whose rights are at stake. Stanley, 405 U.S. at 656-57, 92 S.Ct. 1208. By employing a no-bail scheme that conclusively equates unlawful immigration status with unmanageable flight risk, Arizona is needlessly locking up undocumented immigrant arrestees awaiting trial under the guise of ensuring their appearance at trial, even though many of these individuals would voluntarily appear for trial if released on bail and could demonstrate such willingness if provided the opportunity, or other methods exist to assure their appearances. The excessiveness and overbreadth of this scheme, particularly in light of its legislative history, reveal that the real purpose of Proposition 100 was to use the categorical denial of bail to punish arrestees — for their assumed undocumented status and for their suspected but unproven crimes.
I would hold that Proposition 100 violates substantive due process because it fails both prongs of the Salerno test, either one of which is sufficient to find Arizona’s categorical denial of bail here unconstitutional. I therefore respectfully dissent.

. To Rep. Pearce, Proposition 100 would punish undocumented immigrants for two wrongs: being present in the United States unlawfully and committing (more accurately, being arrested for) a felony. See Senate Judiciary Committee Meeting on H.B. 2389, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005) ("[B]ad enough you’re illegal but you commit a serious crime you ought not to be bondable.”); id. (''[T]his bill targets very simply those who commit serious, serious [criminal] acts in our community. A very responsible bill to protect our citizens from those who would enter our country illegally and commit serious crimes against ús.”). Both of Pearce's reasons are impermissibly punitive. Bail cannot be denied to punish immigrants for being in the country illegally. *1075 Nor can it be denied to punish them for charged, but unproven, crimes. See Bell, 441 U.S. at 535, 99 S.Ct. 1861 ("[UJnder the Due Process Clause, a [defendant] may not be punished prior to an adjudication of guilt in accordance with due process of law."); Salerno, 481 U.S. at 746, 107 S.Ct. 2095 (citing Bell for the proposition that pretrial detention violates substantive due process when it constitutes "impermissible punishment before trial”). As the Supreme Court has recognized, "Arizona may have understandable frustrations with the problems caused by illegal immigration,” Arizona v. United States, 132 S.Ct. at 2510, but punishing undocumented immigrants by denying them bail is not a permissible expression of that frustration.

. Salerno does not require the plaintiffs to prove that punishment was the sole or even the predominant purpose of the legislation. Even if that were a requirement, however, the plaintiffs have satisfied it here. Cf. McCreary Cnty. v. ACLU of Ky., 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) ("When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides.”); City of Indianapolis v. Edmond, 531 U.S. 32, 46-47, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (holding that a checkpoint program with an impermissible primary purpose violated the Fourth Amendment even though the program served lawful secondary purposes); Bush v. Vera, 517 U.S. 952, 959, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (concluding that in a "mixed motive” case challenging race-conscious redistricting on equal protection grounds, strict scrutiny would apply only if race was the “predominant factor” in drawing the districts).

. This, of course, is not the first time Arizona’s concerns about illegal immigration have resulted in impermissible legislation. See, e.g., Arizona v. United States, 132 S.Ct. at 2503, 2505, 2507 (striking down alien-registration and criminal provisions targeting undocumented immigrants as preempted by federal law); Valle Del Sol, Inc. v. Whiting, 709 F.3d 808 (9th Cir.2013) (enjoining day laborer provisions targeting undocumented immigrants as a violation of the First Amendment).

. Before Proposition 100 passed, Arizona had an extensive bail scheme designed to help ensure that arrestees appear for trial. See Ariz. Const, art. II, § 22 (West Nov. 27, 2006 version); Ariz.Rev.Stat. § 13-3967(B). These procedures already required judges to consider the arrestee's immigration status when making bail determinations. See Ariz.Rev. Stat. § 13-3967(B)(11M12). The defendants have not shown that this set of regulations, addressing flight risk on a case-by-case basis, was inadequate to protect the state's legitimate interest in ensuring arrestees' appearance at trial.

. Neither Demore's holding nor the statistics cited therein helps establish the constitutionality of pretrial detention in criminal cases. Demore approved the brief detention of an alien pending removal proceedings when the alien had already been convicted of an enumerated crime. See Demore, 538 U.S. at 513, 123 S.Ct. 1708. The periods of detention at issue in Demore were short- — an average of 47 days if the alien did not appeal the decision of the Immigration Judge, or four months if the alien appealed. See id. at 529, 123 S.Ct. 1708. The time between an arrest and a criminal trial can last far longer. Before passing the law at issue in Demore, Congress reviewed several studies concerning recidivism rates of criminal aliens and their rates of failure to appear for subsequent removal hearings. See id. at 518-20, 123 S.Ct. 1708. These studies, however related to convicted immigrants appearing for their removal proceedings; they do not provide support for Proposition 100, which ostensibly rests on arrested immigrants appearing for their criminal proceedings. Congress also had specific reason to conclude that, under the circumstances at issue in Demore, case-by-case determinations of suitability for release would be ineffectual. See id. at 528, 123 S.Ct. 1708. Importantly, the Supreme Court approved the brief detention of criminal aliens in Demore in recognition of Congress' "broad power over naturalization and immigration," which allows Congress to "regularly make[ ] rules that would be unacceptable if applied to citizens." Id. at 521, 123 S.Ct. 1708. The states do not have plenary power over naturalization and immigration.

. The majority finds it odd that I am “comfortable” with this anecdotal evidence but not comfortable with Arizona’s anecdotal evidence of undocumented immigrants evading justice by leaving the United States. Maj. Op. at 1063 n. 10. But I do not suggest that anecdotal evidence cannot inform legislation; rather, I believe anecdotal evidence, standing alone, cannot support an irrebuttable presumption affecting substantial rights. I mention the anecdotal evidence of some undocumented immigrants posting bail and continuing to appear for their court dates and trial not to suggest a per se rule that undocumented immigrants should receive bail. On the contrary, I cite this evidence to illustrate the need for an individualized inquiry regarding the flight risks posed by particular undocumented immigrants, whose be *1078 havior in the face of criminal charges is not as homogeneous as Arizona assumes it to be.

. Unlike the Bail Reform Act provision Salerno upheld, which applies only to a narrow category of extremely serious offenses, see Salerno, 481 U.S. at 750-51, 107 S.Ct. 2095, Proposition 100 applies to anyone arrested for a Class 1, 2, 3 or 4 felony or aggravated driving under the influence. This broad list of crimes includes nonviolent offenses such as unlawful copying or sale of sound recordings, see Ariz.Rev.Stat. § 13-3705, altering a lottery ticket with intent to defraud, see id. § 5-566, and tampering with a computer with the intent to defraud, see id, § 13-2316. Non-custodial sentences are possible for several of these crimes.

. A recent study of undocumented immigrants in California, conducted by the Center for the Study of Immigrant Integration at the University of Southern California, found that, "contrary to popular misconceptions,” undocumented immigrants "are a fairly settled population.” Undocumented Californians, Immigration Reform, and Our Future Together (May 2013), available at http://csii.usc.edu/ documents/whats_at_stake_for_the_state.pdf. The researchers found that 50 percent of undocumented immigrants have been in the United States for more than 10 years; 17 percent of those who are household heads áre homeowners; and millions more have U.S.born children. See id. at 9, 15. These data about Arizona's neighboring state cast grave doubt on Arizona’s irrebuttable presumption that undocumented immigrants lack strong ties to the community.

. Assuming categorical denials of bail for capital offenses are constitutional (although no federal appellate court has yet so decided), such a result would likely be based on the Anglo-American legal tradition, which has a unique history of denying bail in capital cases. See Hunt v. Roth, 648 F.2d 1148, 1159-60 (8th Cir.1981) (discussing the historical basis for the denial of bail for capital crimes), vacated as moot sub nom. Murphy v. Hunt, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). Similar historical underpinnings do not support categorical denial of bail for other crimes or, as here, on the basis of immigration status.

. Of course, even if Arizona’s bail scheme were better represented among the states, a challenged law does not become constitutional simply because it has company. See, e.g., Lawrence v. Texas, 539 U.S. 558, 570, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (striking down a Texas law criminalizing homosexual intercourse, even though similar laws existed in nine states); Loving v. Virginia, 388 U.S. 1, 6, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (striking down a Virginia statute prohibiting interracial marriages, although Virginia was one of 16 states to have such a prohibition).