**REVERSE and REMAND; and Opinion Filed March 20, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01278-CR

**MIGUEL ALBERTO GUTIERREZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 196th District Court**
**Hunt County, Texas**
**Trial Court Cause No. 27,326**

## OPINION

Before Justices O'Neill and Myers[1]
Opinion by Justice O'Neill

Appellant Miguel Alberto Gutierrez appeals his conviction for aggravated robbery. After appellant pleaded guilty to the offense, the jury assessed punishment at thirty years' imprisonment and a $10,000 fine. In three points of error, appellant contends (1) he was denied a fair trial and due process of law when the prosecutor used his ethnicity and immigration status as a reason to deny him probation, and (2) he received ineffective assistance of counsel. Because we conclude appellant received ineffective assistance of counsel, we reverse the trial court's judgment and remand for a new hearing on punishment.

Because claims of ineffective assistance of counsel require we review the totality of the representation, and because we must review the entire record to determine prejudice, we recount

---

[1] Although Justice Brown was initially on the panel, she did not participate in deciding this cause. TEX. R. APP. P. 41.1(b).

the trial proceedings in some detail. Appellant pleaded guilty to a jury the aggravated robbery of Chassidy Bond. The indictment alleged appellant, acting with E.G., a juvenile, committed the robbery and caused "serious bodily injury" to Bond by striking her in the face and head "with his fist(s) and hand(s) and a DVD box and an object unknown to the grand jury" causing "a temporary loss of consciousness and a concussion and balance problems and hearing loss."

At the trial to determine appellant's punishment, the State presented evidence that on October 11, 2010, appellant, who was then seventeen, and his friend, E.G. who was sixteen, entered a Valero convenience store where Bond was working the graveyard shift. They wore hats and sunglasses. Appellant went to the back of the store and got a drink, and E.G. stood near the register pretending to look at videos. When appellant went to the counter with the drink, Bond opened the register. As soon as she did, E.G. struck her in the head, knocking her to the ground. Appellant ran around the counter and emptied the register. E.G. continued to hit Bond, as she attempted to cover her face. When appellant emptied the register, they fled. After they left, Bond called her boyfriend, who came to her assistance. Meanwhile, a customer entered, and he called police.

Officer Joel Gibson responded to the call. Gibson photographed Bond's injuries, which showed a long cut on her forehead, blood on her ear, abrasions on her face, and a bloody nose. He said Bond was fuzzy and blurred. He did not get a statement from her at that time because it was apparent she needed to seek medical attention.

Two days after the offense, Bond went to the police station to give a written statement. Gibson said at that time, she seemed much clearer and was able to provide more details. In her statement, she said the offense was committed by two young Hispanic males. One of them hit her in the right temple, which "knocked her out" instantly. She said he continued to hit her with a DVD case about twelve to fifteen times. After the "shorter one" grabbed the cash, they fled.

–2–

She said she "woke up" before the last one could actually get out of the store. She said she could identify both individuals because they had come in the store the night before, were caught stealing, and she had it on videotape. That videotape and a videotape of the robbery were admitted into evidence.

Gibson testified that when Bond went to the police station to give her statement, she took her old yearbook from Bland High School with her to identify appellant and E.G. He identified State's exhibit 13 as the yearbook page she used to identify appellant by placing a mark next to his photograph. State's exhibit 13 shows a star mark under E.G.'s eighth grade school picture, but appellant's photograph is not on the page.

At the time Bond identified E.G., he had moved to McKinney and had dropped out of school. Gibson said two efforts were made to locate him at the McKinney residence where his family lived, but both efforts were unsuccessful. Because E.G. was a minor, no warrant issued for his arrest. Gibson has since heard that E.G. may have fled to California or Mexico.

About ten days after the offense, appellant, who was still a student at Bland High School, went to his P.E. teacher, Rodney Godwin, and told him he had something he wanted to get off his chest. He then confessed that he and E.G. had robbed the Valero, and told Godwin that E.G. had hit Bond with a hammer. Appellant claimed he committed the offense because he owed some Dallas drug dealers money, and he was afraid for his and his family's lives. Godwin felt appellant was remorseful, and he encouraged appellant to turn himself in. After appellant left his office, Godwin called police. Godwin said he and appellant had a good rapport, and appellant had been one of Godwin's "special projects" he was trying to get in the "right direction."

Bond testified at trial. She said she had just started working the graveyard shift when the robbery happened. She said the night before the robbery, E.G. and appellant were in the store.

She said she knew E.G. from when they went to the same school and appellant from being "in the store." She had suspected them of shoplifting multiple times before, but this time she saw E.G. put a pack of gum in his pocket, and she stopped them. Although they denied the theft, E.G. returned the gum. Bond said it was not an "unpleasant conversation." The following night, they came in the store again at about 2 a.m., wearing hats and sunglasses. Bond sensed something was up because of their age, the time of evening, and what they were wearing.

She said when she opened the register, E.G. hit her, and she "blacked out." She does not recall the assault, but when they fled, she remembers getting up and calling her boyfriend. Bond went to the hospital for her injuries. She suffered a concussion, a cut on her forehead, and swelling all over her face. She was supposed to go back to the hospital several days later, but she does not think that she did.

After the assault, she suffered headaches and vision problems, which went away when the swelling went away. She said she still cannot hear as well as she used to and sometimes gets dizzy, causing her to suffer balance problems. She also testified that her memory had been affected because, although she can remember the night of the offense, she cannot remember getting hit.

Bond said after the offense, she returned to work, but had lost some income because of her injuries and had significant unpaid medical bills. She later left her job because it "caught on fire." She said after she lost her job from the fire, she had problems paying her school loan. She said that since the robbery, she has problems with trusting people, and she now felt a little guilty because she is nervous around Hispanic males, and she knows not all Hispanic males could do something like that.

Appellant was arrested at his house five days after he confessed to Godwin. Gibson interviewed him, and appellant again confessed to the offense. When appellant confessed to

–4–

Godwin, appellant did not blame the offense on the drug debt. Godwin said appellant had "maybe to some degree" minimized his conduct in confessing to the offense. But Godwin also conceded that appellant appeared to give police the "college try" to help find E.G. He also testified that after the offense, appellant appeared to "do the right thing by coming clean" with his coach and the police.

Appellant testified and admitted participating in the offense. He also admitted he was with E.G. when Bond caught E.G. shoplifting the night before. He denied knowing that Bond would be working the night of the robbery, stating that she usually worked days. He admitted lying to Godwin when he tried to blame his commission of the offense on his fear of Dallas drug dealers. He admitted he was trying to come up with an excuse. Appellant claimed he did not know E.G. had initially "hit" Bond and thought he had tackled her to the ground, but when he looked he "saw everything." Appellant testified that police had told him E.G. had "used" a hammer, but said he "already knew about it."

To establish his eligibility for probation, appellant testified he had never been convicted of a felony. He also testified that "other than a traffic ticket," he had no crimes of moral turpitude. Appellant also admitted he had had problems with marijuana and "pills," like Xanax, and had been to rehab twice. Appellant said that after he was arrested, he spent eighteen months in jail before he was released on a $100,000 bond. He said he did not get into any significant trouble in jail, and since being released, he has been working for his father.

During her cross-examination, the prosecutor began a line of questioning concerning appellant's citizenship and immigration status. She first asked whether appellant was a "legal citizen." When appellant said he was not, she asked whether he had ever driven a car. Appellant admitted that he had, and that he had neither a driver's license nor liability insurance. She asked "[w]hy would this jury give probation to an individual who is not legally in our country."

Appellant's trial counsel objected that the question "invaded the province of the jury." The prosecutor responded that she "would like appellant to explain why he thinks he is entitled to [a second chance] when he's not legally present here in our country." The trial court did not rule on the objection, and instructed the prosecutor to rephrase. The prosecutor then asked appellant why the jury should give him "an opportunity to stay in Hunt County, out of jail, when you're not legally in our country." Appellant said he wanted to prove he could do better. The prosecutor responded, "[d]o you understand that by being here today, you're breaking the law?"

Appellant's mother testified and apologized for her son's actions. She said she had brought appellant to the United States when he was five-years-old, and he had no say in the matter. Appellant's father also testified that since appellant's release from jail, he has seen many positive changes in him and he has become a hard worker. He thought appellant could redeem himself and become a productive member of society.

In closing, the prosecutor argued for a serious sentence, asserting appellant had failed to come clean, was continuing to tell lies, had failed to turn himself in to police, and had failed to show remorse. She further argued that appellant only confessed because he "got caught." She asserted the robbery was a crime of revenge against Bond because they wanted to teach her a lesson for catching them stealing.

Trial counsel argued for leniency based on appellant's age, he was not the person that inflicted the injuries, and he had confessed to his participation in the crime. Trial counsel conceded appellant had made mistakes, and requested the jury to give him a second chance. He asked the jury to assess a probated ten-year sentence, pointing out that appellant had already been in jail for eighteen months for the offense, and appellant could be required to serve the sentence if he could not comply with the conditions of his probation. Finally, trial counsel argued his own children had made mistakes, and he would never give up on them. He argued,

"[A]t the end of the day, that's your kid. Well, [appellant] is our kid. This is a Hunt County kid who completely messed up, completely messed it up but who has done every single thing since that day right."

In rebuttal, the prosecutor made the following references to citizenship, appellant's immigration status, and his candidacy for probation. In direct reference to appellant's failure to have a Texas driver's license, she asserted appellant had no respect for the laws of "our" country. She argued, "[t]his court room is about justice. Justice for a citizen of our United States." She continued:

> This is not your kid. This guy is not even a citizen of our country. He is not your kid. Your kid has been raised to follow the rules. Your kid understands when he does something wrong, his mom and dad are going to take him under hand.
>
> Your kid follows the law. Your kid wouldn't be sitting in that chair. Your kid wouldn't have hurt that lady. Your kid when he was caught doing something wrong would have told her, thank you very much. I am so grateful, and I will never do this again and meant it with every fiber of his being. That's what your kid would have done.
>
> This young man has parents. He has parents, and they are not you. He is not a candidate for probation in Hunt County. He's not even legally here. He is breaking the law by being present in our community
>
> Probation requires an individual live in a certain place, report at a certain time and do certain things. This young man cannot legally be in Hunt County. He cannot legally report to probation. He cannot legally appear in this courtroom. He is not a candidate for probation.

She requested a fifty-year sentence. The jury assessed a thirty-year sentence, and a $10,000 fine.

In his first point of error, appellant contends he was denied a fair trial, due process, and equal protection when the prosecutor used his ethnicity and immigration status as a reason to deny a probated sentence. A defendant's failure to make a timely and specific objection during trial forfeits complaints about the admissibility of evidence. *Saldano v. State*, 70 S.W.3d 873,

–7–

889 (Tex. Crim. App. 2002). A defendant must object to evidence even if the evidence was elicited solely to appeal to the potential racial prejudices of the jury. *Id*. Therefore, this complaint is not preserved for review. *Id*. at 890. We resolve the first issue against appellant.

In his second and third issues, appellant asserts he received ineffective assistance of counsel based on trial counsel's failure to object to the prosecutor's questions and argument about his nationality and immigration status. To successfully assert an ineffective assistance of counsel challenge, an appellant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant. *See Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). An ineffective assistance claim must be "firmly founded in the record," and the record must "affirmatively demonstrate" the claim has merit. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). We look to the totality of the representation and the particular circumstances of each case. *Thompson v. State,* 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

There is no question that discrimination based on race, ethnicity or national origin is prohibited by the due process, due course of law, equal protection, and equal rights clauses of the United States and Texas constitutions. *Flores v. State*, 904 S.W.2d 129, 130 (Tex. Crim. App. 1995). Further, the equal protection clause of the United States Constitution also protects immigrants whose presence in this country is unlawful. *See Plyler v. Doe*, 457 U.S. 202, 212 (1982). Sentencing a defendant more harshly based solely on his alien status violates the defendant's constitutional right to due process. *See United States v. Garcia-Cardenas*, 242 Fed. Appx. 579, 583 (10th Cir. 2007); *United States v. Onwuemene*, 933 F.2d 650, 651 (8th Cir. 1991); *United States v. Gomez*, 797 F.2d 417, 419 (7th Cir. 1986); *see also United States v. Borrero-Isaza*, 887 F.2d 1349, 1352 (9th Cir.1989). However, certain factors that may

accompany such status may provide a rational basis to use such status against a defendant. *See Infante v. State*, 25 S.W.3d 725, 727 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *Garcia-Cardenas,* 242 Fed.Appx. at 583; *Gomez*, 797 F.2d at 420.

The State asserts trial counsel was not ineffective because the evidence and the arguments about appellant's status as an unauthorized immigrant were proper for three related reasons. First, the State maintains appellant's immigration status was relevant at punishment as a "prior bad act." Second, it asserts the evidence was admissible to correct the "false impression" appellant had left with the jury concerning his criminal record and his ability to get a job to pay the victim restitution. Finally, it asserts the evidence was admissible to show appellant could not comply with the requirements of probation. We conclude none of these reasons permitted the State to use appellant's immigration status against him in assessing punishment.

We begin by noting the State's arguments in the trial court and on appeal are all premised on a misstatement, or misunderstanding, of well-settled federal law. Specifically, the State incorrectly asserts appellant's presence in the United States, standing alone, is an offense. Unlawful *entry* and unlawful reentry into the country are federal offenses. 8 U.S.C. §§ 1301, 1326. *Arizona v. United States*, 132 S.Ct. 2492, 2499 (2012). Once here, aliens are also required to register (and must carry proof of registration after they reach the age of eighteen) and willful failure to do so is a federal misdemeanor. *See Id.*; 8 U.S.C. § § 1304(3), 1306(a); *See also Arizona*, 132 S.Ct. at 2499. But, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*. 132 S. Ct. at 2506. Nor is it a crime for a removable alien to engage in unauthorized employment. *See Arizona*, 132 S. Ct. at 2504 ("Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment.").

Here, the evidence showed appellant's parents brought him to the United States when he was five-years-old. He was arrested when he was seventeen-years-old, still living with his parents, and attending high school. After his arrest, appellant thereafter remained incarcerated until he posted a $100,000 bond to secure his presence in Hunt County. The record is silent as to whether appellant registered as an alien. The United States Supreme Court has held that a State cannot penalize the children of unauthorized aliens who can neither affect their parents' conduct nor their resident status. *See Pyler*, 457 U.S. at 220. Under these circumstances, the State failed to show appellant's status was admissible as an extraneous offense or prior "bad act."[2] Therefore, the State's reliance on cases involving defendants who illegally enter the United States is misplaced. *See Garcia-Cardenas*, 242 Fed. Appx. at 583; *Gomez*, 797 F.2d at 419; *see also Plyler,* 457 U.S. at 220 (noting distinction between an adults' undocumented status as being the product of conscious action, and a minor child's status as generally being out of the child's control). For the same reasons, the evidence was not admissible to cure the allegedly "false impression" appellant left when he testified about his desire to comply with the conditions of his probation or his criminal record.[3]

We further conclude the prosecutor's argument that appellant was not a "candidate" for probation was improper. The prosecutor did not argue appellant was not a "good" candidate for probation, but that he was not a candidate at all. This argument was not based on any particular circumstances that applied to appellant, or any other additional factors that might be associated with unauthorized status. Rather, she based it on a *categorical* argument that *any* unauthorized

---

[2] For extraneous conduct to be admissible there must be sufficient proof to show beyond a reasonable doubt the conduct was committed. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (West 2006). We disagree with *Infante v. State* to the extent it held the trial court could have properly taken the defendant's alleged status as an illegal alien into account absent proof the defendant was even an illegal alien. *See Infante,* 25 S.W.3d at 727.

[3] We note that appellant was still a juvenile under Federal law at the time of the offense, so even if there was evidence he had failed to register, this would constitute an act of delinquency, not a criminal offense. See 18 U.S.C. § 5031 (a "juvenile" is a person that has not attained his eighteenth birthday).

immigrant cannot meet the terms of probation. On appeal, the State again relies on its assertion that mere presence in the United States is an offense to support its contention that the argument was proper. However, as noted above, it is not. But equally problematic is that the prosecutor's argument is in direct conflict with the probation eligibility requirements set by the Texas Legislature in the code of criminal procedure, which required appellant to show only that he had never before been convicted of a felony offense. TEX. CODE CRIM. PRO. Art. 42.12, § 4(d)(3), 4(e) (West Supp. 2013). The Texas Legislature has not imposed a categorical ban on probation for unauthorized immigrants, assuming it could properly do so.[4]

Additionally, the prosecutor's references to appellant's immigration status were not limited to whether appellant could comply with the terms of probation as a practical matter, but she also argued that his status justified a harsher punishment. She argued, this case is about "[j]ustice for a citizen who lives here, who is a citizen of our United States" and that appellant "was not even a citizen of this country." She suggested appellant was not "entitled" to a "second chance" because he was "not legally present here in our country."

On appeal, the State asserts these arguments were proper to show appellant was not "a local kid" in response to trial counsel's argument that appellant was "our kid," a "Hunt County kid." The only evidence in the record was that appellant had lived in the United States since he was five-years old, and attended the local high school. While we agree the State could argue appellant was not "their kid," it could not do so by referencing appellant's citizenship or immigration status.

---

[4] The United States Supreme Court has made it clear a State is not permitted to punish an alien based on his illegal presence in the United States or impose any complimentary, additional, or auxiliary regulations regarding the illegal presence of aliens in the State. *Arizona*, 132 S. Ct. at 2503.

Having concluded the prosecutor's questioning and arguments were improper, we must now determine whether counsel was ineffective for failing to object. Because appellant did not file a motion for new trial, the record does not reflect counsel's reasoning for not objecting. Under these circumstances, we can rarely determine the record is sufficient to show ineffective assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). But when no reasonable trial strategy could justify trial counsel's conduct, trial counsel's performance falls below an objective standard of reasonableness as a matter of law. *Andrews*, 159 S.W.3d at 102.

Trial counsel failed to object to the prosecutor's repeated statements and arguments that appellant's immigration status meant he was not a candidate for probation, and further that appellant's status and lack of citizenship should be used as an aggravating factor in assessing appellant's punishment. We conclude this is one of those rare instances in which we can conceive of no possible basis in reasonable strategy or tactics for trial counsel's failure to object.

We further conclude appellant has shown a reasonable probability that, but for counsel's errors, the sentencing jury would have reached a more favorable verdict. *See Ex Parte Rogers*, 369 S.W.3d 858, 862-63 (Tex. Crim. App. 2012). Appellant asserts he was prejudiced because the jury assessed a thirty-year sentence, even though he was only seventeen when he committed the offense, admitted his guilt, and was eligible for probation. Although not argued in its brief, during oral argument the State asserted the thirty-year sentence was not based on appellant's immigration status, but on the egregious nature of the offense.[5] While we agree the offense was serious, we cannot conclude the facts of this offense were so egregious that the jury was not influenced by the improper evidence and argument concerning appellant's citizenship and immigration status. After reviewing the entire record, we conclude the probability of prejudice

---

[5] Among such circumstances the State asserted justified the sentence was that the victim had continued to suffer nightmares, and had lost her job and had to drop out of school because of her injuries. There is no evidence in the record to support these assertions and, indeed, both are contradicted by Bond's trial testimony.

–12–

is sufficient to undermine our confidence in the outcome of the punishment phase. Therefore, we reverse the trial court's judgment and remand to the trial court for a new punishment hearing. TEX. CODE CRIM. PROC. ANN. art. 44.29(b) (West Supp. 2013).

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE

Do Not Publish
Tex. R. App. P. 47.7

121278F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MIGUEL ALBERTO GUITERREZ,
Appellant

No. 05-12-01278-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 196th District Court,
Hunt County, Texas
Trial Court Cause No. 27,326.
Opinion delivered by Justice O'Neill.
Justices Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **REVERSED** and the cause **REMANDED** for further proceedings pursuant to TEX. CODE CRIM. PROC. ANN. Art. 44.29(b).

Judgment entered this 20th day of March, 2014.

/Michael J. O'Neill/

MICHAEL J. O'NEILL
JUSTICE