People v Guerrero (2026 NY Slip Op 00826)

People v Guerrero

2026 NY Slip Op 00826

Decided on February 17, 2026

Court of Appeals

Troutman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 17, 2026

No. 8 

[*1]The People & c., Respondent,
vErrick Guerrero, Appellant.

Bradley E. Keem, for appellant.
Elisabeth A. Dannan, for respondent.
The Bronx Defenders et al., District Attorneys Association of the State New York, amici curiae.

TROUTMAN, J.

Defendant, four months shy of his 18th birthday, participated in a premeditated, armed home invasion, the latest transgression in a pattern of escalating criminal behavior for which he had been receiving services in Family Court for approximately five years. The grand jury jointly indicted defendant and his accomplices on two counts of burglary in the first degree (Penal Law § 140.30 [2], [3]) and one count of robbery in the first degree (id. § 160.15 [3]). Under the State's Raise the Age legislation (L 2017, ch 59, pt WWW, § 1-a), defendant's prosecution was presumptively removable from the youth part of County Court to Family Court (see CPL 722.23). The sole question before us is whether the youth part abused its discretion as a matter of law in granting the People's motion to prevent removal. Because the court did not abuse its discretion in reaching that determination, we affirm.
After defendant's arraignment, the People moved to prevent removal on the ground that extraordinary circumstances existed that should prevent transfer to Family Court (see CPL 722.23 [1] [a], [d]). Specifically, the People asserted that the facts and circumstances of this premeditated attack were frightening and extraordinary and bespoke a level of criminal liability inappropriate for adjudication in Family Court. They argued that police reports provided to the court demonstrated the existence of such circumstances and asserted that, in February 2021, defendant and his accomplices, each with a knife and one with a handgun, planned to break into the victim's home to rob him and then did so, whereupon they displayed their weapons, seized the victim, and threatened to stab him. One accomplice took the victim's shotgun and struck him with it three times, causing physical injury. Defendant opposed the motion, asserting that he was diagnosed with bipolar disorder, schizophrenia, attention deficit hyperactivity disorder, and oppositional defiant disorder, conditions for which he was prescribed medication and received weekly therapy.
The court convened a hearing, where a probation officer testified that, between May 2016 and January 2021, defenant received eight Family Court appearance tickets and two [*2]adjudications resulting in terms of supervision. Defendant "maxed out" the first term of supervision in November 2017, and the second term expired by the time he was released from a juvenile detention facility in September 2020. Most recently, defendant received an appearance ticket in January 2021 for unauthorized use of a motor vehicle. Since 2016, he had been receiving several Family Court services, each of which the probation officer identified by name. However, the last time defendant appeared in the youth part prior to this incident, his mother declined services on his behalf.
The People argued that defendant had engaged in an escalating pattern of criminal behavior despite having received Family Court services for the past five years. Defendant argued that it was important that he continue to receive services through Family Court because he needed those services to treat his mental health diagnoses.
The court granted the motion. Although the court found that defendant and his accomplices entered the victim's home with the intent to commit a robbery and, during the course of the robbery, struck the victim several times in the face with a shotgun, the court noted further that the violent nature of the alleged crimes was not by itself a basis for preventing removal on the ground of extraordinary circumstances. Rather, the court opined that it was also required to consider whether defendant was amenable to Family Court services. In that regard, the court found that defendant had several mental health diagnoses but, at the same time, had been receiving services for five years. Based on those considerations, the court concluded that the People had demonstrated extraordinary circumstances sufficient for the case to remain in the youth part.
The matter proceeded to a jury trial where defendant was convicted, and he was thereafter sentenced to a state prison term.
The Appellate Division affirmed on the basis that defendant participated in a violent home invasion involving weapons and injuries to the victim, and that, despite the Family Court services provided to him over the five years of his involvement with the criminal justice system, he "made no appreciable positive response and continues to engage in escalating criminal behavior" (235 AD3d 1276, 1278 [4th Dept 2025]). Thus, the Appellate Division concluded that, "under the totality of the circumstances, and taking into account the mitigating factors and the substantial aggravating factors, the court did not abuse its discretion in determining that extraordinary circumstances exist warranting that this case remain in the youth part" (id.). One dissenting Justice concluded that the court abused its discretion (see id. at 1279). Relying on select remarks by the sponsor of the Raise the Age legislation during the Assembly floor debate, the dissenting Justice opined that the legislature intended for the extraordinary circumstances exception to establish a high standard not satisfied here (see id. at 1280-1283). The dissenting Justice granted leave to appeal.
Under the Raise the Age legislation, cases involving adolescent offenders—defined in effect as persons charged with committing a felony at 16 or 17 years old (see CPL 1.20 [44])—are presumptively removed from the newly created youth part of superior court to Family Court (see CPL 722.10 [1]; 722.23 [1]-[2]). Where, however, a defendant is charged with a violent felony as defined in Penal Law § 70.02, the youth part retains the case upon a determination that the defendant (i) "caused significant physical injury to a person other than a participant in the offense"; (ii) "displayed a firearm, shotgun, rifle or deadly weapon" in furtherance of the offense; or (iii) engaged in certain unlawful sexual conduct (CPL 722.23 [2] [c]).[FN1] Otherwise, the case is removed to Family Court unless, upon a motion by the People, the [*3]youth part determines that "extraordinary circumstances exist that should prevent the transfer of the action to" Family Court (CPL 722.23 [1] [d]).
Preliminarily, defendant failed to preserve his contention that the court erred in considering the totality of the circumstances and was instead required to engage in a two-part inquiry, the first part of which is satisfied only if " 'highly unusual and heinous facts are proven and there is a strong proof that the young person is not amenable or would not benefit in any way from the heightened services in the family court' " (People v T.P., 73 Misc 3d 1215[A] [Nassau County Ct 2021]). Defendant did not argue for the application of such a test before the youth part. Instead, he urged the court to deny the motion upon consideration of the totality of the circumstances. Defendant also failed to preserve his challenge under Family Court Act § 381.2 (1) to the admissibility of evidence related to prior proceedings in Family Court (cf. People v Dukes, 186 AD3d 1073, 1074 [4th Dept 2020], affd 37 NY3d 1085 [2021]). Defendant failed to object to the admission of the probation officer's testimony and indeed failed to object to or otherwise dispute any of the People's evidence. Furthermore, unlike our dissenting colleagues, who make repeated reference to the transcript of the subsequent trial, we reject the parties' invitation to consider evidence that was not before the court when it decided the motion.
The only question before us is whether the youth part, considering the totality of the facts and circumstances before it, abused its discretion as a matter of law in determining that extraordinary circumstances existed that should prevent removal to Family Court (see CPL 722.23 [1] [d]). The statute does not define extraordinary circumstances, in contrast to other statutes where the legislature has provided explicit guidance about what constitutes extraordinary circumstances in other contexts (see Domestic Relations Law § 72 [2]; Matter of Suarez v Williams, 26 NY3d 440, 446-448 [2015]; see also CPL former 65.20 [9]; People v Cintron, 75 NY2d 249, 254-255 [1990]). The absence of such guidance evinces a legislative intent to leave the extraordinary circumstances determination within the broad discretion of the court. That intent is confirmed by remarks of the legislation's sponsor during the Assembly floor debate. In answering questions about the meaning of "extraordinary circumstances," he repeatedly emphasized the importance of judicial discretion and need for individualized determinations, explaining that the judge is to have "ultimate discretion" and "must look at all the circumstances of the case, as well as the circumstances" of the young defendant (NY Assembly Debate on 2017 NY Assembly Bill A3009C, April 8, 2017 [hereinafter, "Debate"], at 21, 39), that "every case is going to be looked at by the judge individually, to determine what kind of factors—both aggravating and mitigating—there are in the case, to determine whether or not" extraordinary circumstances exist, and that the extraordinary circumstances standard "is to be determined and shaped by a judge's ruling" (id. at 83-84).
The circumstances of this case could fairly be described as extraordinary. Defendant was no stranger to the criminal justice system. Since age 13, he had been arrested repeatedly, was frequently in Family Court, and had received many services [FN2] over a period of five years that were intended to assist him in leading a law-abiding life. It is undisputed that, despite those services, his criminal behavior escalated to the point that only a month after receiving a Family Court appearance ticket for unauthorized use of a motor vehicle, he participated in a preplanned [*4]home invasion in which he displayed a knife and where his accomplices' conduct in displaying firearms would have mandated retention of the case by the youth part if defendant had done so himself (see CPL 722.23 [2] [c] [ii]). To be sure, defendant's mental health is a substantial mitigating factor, and the alternative conclusion would not have been unreasonable. That is, the court could have found it appropriate for the case to be removed so defendant could continue to receive Family Court services. But we cannot say that the court, after weighing the considerable aggravating and mitigating factors here, abused its discretion as a matter of law in determining that extraordinary circumstances exist that should prevent removal to Family Court.
Contrary to the dissent's concern, our decision today does not treat reoffense "in and of itself" as extraordinary (dissenting op at 12). This is not a case of mere reoffense but of chronic, repeated reoffense and escalating criminal behavior. By the time of the hearing, defendant's history far exceeded one or two youthful transgressions. Moreover, the crime here is deeply troubling. We do not agree with the dissent that a robbery home invasion is a "typical" youth crime (id. at 2) nor that the salient facts here "could readily describe any burglary, robbery, or other violent felony" (id. at 12). In the floor debate, the bill's sponsor provided an example of a far less serious burglary, where "a bunch of young kids who happened on a porch . . . see that there's nobody in the house and they decide to have a party inside" (Debate at 22). In that case, an intent to commit a crime inside the house other than the trespass—e.g., criminal mischief—could elevate the trespass to burglary in the second degree, a violent felony (see Penal Law §§ 70.02 [1] [b]; 140.25 [2]; 145.00 [1]; People v Lewis, 5 NY3d 546, 551-552 [2005]). Such a case, said the sponsor, "could go to" Family Court "if nobody had a gun or a knife or a weapon or used it" (Debate at 22).
That example does not describe the only type of case that should go to Family Court. Nor do the more serious counterexamples mentioned by the dissent—where a defendant targets an elderly victim or acts as a ringleader—describe the only types of cases that should remain in superior court. Most cases, like this one, fall somewhere in the middle, and thus are properly subject to judicial discretion. The dissent's opinion to the contrary would largely remove from these determinations any judicial discretion—a feature the legislation's drafters believed was crucial to the statute's proper functioning.
Accordingly, the order of the Appellate Division should be affirmed.

HALLIGAN, J. (dissenting):

While I agree with the majority that the defendant's challenge under Family Court Act § 381.2 (1) is unpreserved, I would hold that County Court abused its discretion by granting the People's motion to prevent removal. The Raise the Age legislation provides that most felony offenses committed by 16- and 17-year-olds are presumptively removable to Family Court unless the People establish the existence of "extraordinary circumstances" (see CPL 722.23 [1] [d]). A court has substantial discretion in making this determination, but that discretion must be exercised within the bounds envisioned by the Legislature. For that guidance, we look to the statute's text and legislative history, which make clear the objective: to provide treatment and services rather than adult punishment to young people, even those charged with violent felonies, except in a very narrow swath of cases. Consistent with that goal, a court can deny removal on this basis only in rare cases where it determines that the totality of circumstances qualify as "extraordinary." As the legislative history indicates, that inquiry requires consideration of whether the People have demonstrated particularly unusual and heinous facts and strong proof that the defendant is not amenable to services.
The record here cannot support a determination of "extraordinary circumstances." The facts of the defendant's crime are certainly troubling, but they are also typical of many violent felonies which are nonetheless presumptively removable to Family Court. The sparse information regarding the defendant's Family Court history, which includes only a few facts regarding some of his previous tickets and adjudications and his five years of services, cannot support a finding that he would not be amenable to additional services, particularly in light of his mental health history. Because affirming on these facts will lower the bar for finding extraordinary circumstances in a manner fundamentally inconsistent with the Legislature's intent that removal be available in all but the most serious cases, I respectfully dissent.I
When defendant Errick Guerrero was 17 years old, he and three co-defendants robbed a common acquaintance. The oldest co-defendant, then 22 years old, suggested the robbery, supplied the group with latex gloves, and sold the defendant a kitchen knife. The other three carried pocketknives [FN1]. All four wore ski masks. The group went to the victim's residence, where they found him playing video games, and they told him to get on the floor and give them money. When the victim attempted to grab his shotgun, one of the co-defendants grabbed it and used it to hit the victim in the face. The victim testified that he "hear[d] one of the kids say stab him, stab him." The victim eventually escaped, and the defendant, along with all but one of his co-defendants, left with money, shotgun shells, and drugs. One of the co-defendants was captured and detained at the house by the victim's aunt, with the victim's assistance.
When police arrived, the victim's mouth was bleeding, his eye was cut and bruised, and he had scrapes on his forehead. Later that day, the defendant sent taunting messages to the victim via social media, including images of himself holding money. The defendant and his three co-defendants were charged with first-degree burglary and first-degree
robbery, and the victim was charged with seventh-degree criminal possession of a controlled substance and unlawful possession of marijuana.
Because the defendant was 17 at the time of the crime, his proceedings began in the Youth Part of County Court and were presumptively removable to Family Court under CPL 722.23 (2). While conceding that removal was not precluded by any of the circumstances enumerated in subsection (2) (c) (significant physical injury, display of a deadly weapon, or unlawful sexual contact), the People moved to prevent removal on the basis that "extraordinary circumstances" existed under subsection (1) (d).
At a hearing on the motion, the defendant's probation officer addressed his prior involvement with Family Court. She testified that he "had eight family court appearance tickets that began in 2016" and "two adjudications," both of which "led to a term of supervision"; that the defendant "maxed out" on his terms of supervision; and that the most recent ticket was for unauthorized use of a motor vehicle. The officer identified various services that the defendant had been provided "throughout the last five years," including two Salvation Army programs, Arise, and a church-based counseling program. The officer also noted that the defendant's mother had declined services at his last appearance.
The court granted the People's motion. After briefly noting the facts of the crime, the court concluded that extraordinary circumstances existed because the defendant had been "engaged in services for over a period of five years" — a duration that the court deemed "not insignificant" — and thus he "[was] not amenable to the services." The court made no finding on the record as to whether the crime was unusual and heinous in nature. The Appellate Division affirmed.II
CPL 722.23 was adopted as part of the 2017 Raise the Age legislation, which was intended to ensure "that youth who are charged with a crime may be treated in a more age appropriate manner" (Assembly Mem in Support of 2017 NY Assembly Bill A04935). The extraordinary circumstances provision operates as an exception to the general rule that for all but certain enumerated offenses, the age of criminal responsibility will be 18.
Prior to Raise the Age, New York's juvenile justice system was among the harshest in the country (Human Rights for Kids, The Mass Incarceration of Children in New York 4 [2024], available at https://humanrightsforkids.org/publication/the-mass-incarceration-of-children-in-new-york [last accessed Jan. 23, 2026]). New York had led a national effort to toughen treatment of youth offenders by deciding, in 1978, to set the age of criminal responsibility as low as 13 or 14 for certain serious crimes (see id. at 3-10). That trend began to reverse in the early 2000s, as other states adopted juvenile justice reforms (see Final Report of the Governor's Commission on Youth, Public Safety, and Justice: Recommendations for Juvenile Justice Reform in New York State at 28 [2015])[FN2]. But New York "lag[ged] behind" (id. at 33). By 2015, it was one of only two states that set the age of criminal responsibility for all crimes at 16, while the "vast majority" of states set that age at 18 (see id. at 3).
New York's unusually harsh scheme appeared in tension with an emerging and widespread scientific consensus about youth offenders. From 2005 to 2012, the U.S. Supreme Court relied on that consensus in a series of landmark decisions recognizing that the Eighth Amendment prohibits certain harsh punishments for juveniles (see Roper v Simmons, 543 US 551 [2005] [death penalty]; Graham v Florida, 560 US 48 [2010] [life without parole for homicide offenses]; Miller v Alabama, 567 US 450 [2012] [life without parole for non-homicide [*5]offenses]). The Court explained that juveniles are categorically different from adults in several key respects. First, juveniles' immaturity and underdeveloped sense of responsibility "often result in impetuous and ill-considered actions and decisions," which explains why "adolescents are overrepresented statistically in virtually every category of reckless behavior" (Roper, 543 US at 569, citing Jeffrey Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Rev. 339 [1992]). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," which is "explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment" (id., citing Laurence Steinberg & Elizabeth S. Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 [2003]). Third, "the character of a juvenile is not as well formed as that of an adult" (id. at 570, citing Erik H. Erikson, Identity: Youth and Crisis [1968]).
Relying on this scientific consensus, and consistent with the trend in other states, the Legislature enacted Raise the Age in 2017 (see L 2017, ch 59, § 1, part WWW). The goal was clear: to "unequivocally stat[e] that children should not be treated like adults — especially in our prison system — because they are children and they are immature. We know that they will make mistakes. As children, they should always have an opportunity to get back on the right track" (NY Assembly Debate on 2017 NY Assembly Bill A3009C, April 8, 2017, at 86 [hereinafter "Assembly Debate"]). Legislators explained that it does not "serve society" to take a "young person who did something stupid" and "marginaliz[e] him with a criminal record" (id. at 49-50), which is "a short-[sighted], and a proven ineffective approach" that "does not keep our communities safer" (id. at 86).
To this end, the legislation provided that almost all felony offenses by 16- and 17-year-olds would be handled in new Youth Parts of superior court, and those proceedings would be presumptively removable to Family Court. The People can prevent removal of violent felonies and certain Class A felonies by demonstrating that the defendant caused significant physical injury, displayed a firearm, or engaged in specified unlawful sexual contact (CPL 722.23 [2] [c]). For other crimes, including violent felonies and certain Class A felonies which do not meet any of those three conditions, the People can block removal only on a showing of "extraordinary circumstances that should prevent the transfer of the action to family court" (CPL 722.23 [1] [d]).
In the Assembly floor debate, the bill's sponsor [FN3] explained that the extraordinary circumstances provision reflected a compromise: "only those cases [with] truly violent felons would stay in the criminal part [sic], and those kids who were not violent would be able to find their way to the family court where they could not only get superior services, but would be able to get better outcomes for their lives" (Assembly Debate at 21). Thus, "it [was] intended that the exceptional circumstances requirement will be a high standard for the DA to meet" (id. at 39). Transfer to Family Court would occur "in the overwhelming bulk of the cases"; "only one out of 1,000 cases . . . for example, those extremely rare and exceptional cases, would remain in the youth part" (id. at 37-38).
The sponsor noted that in evaluating whether extraordinary circumstances exist, courts must individually assess "all the circumstances of the case, as well as . . . all of the circumstances of the young person," including "aggravating factors" and "mitigating circumstances" (Assembly Debate at 39-40; see also id. at 83-85). The sponsor also emphasized two considerations that are crucial in that analysis: first, whether "highly unusual and heinous facts are proven," and second, whether there is "strong proof that the young person is not amenable or would not benefit in any way from the heightened services in the family court" (id. at 39). Relying on that statement, lower courts have widely considered those two factors in making extraordinary circumstances determinations (see e.g. People v Lloyd F., — AD3d &mdash, 2025 NY Slip Op 04583, at *4 [2d Dept 2025]; People v M.M., 64 Misc 3d 259, 271-272 [Nassau County Ct 2019]).III
Given the backdrop of this legislative history, I cannot subscribe to the majority's conclusion that "[t]he circumstances of this case could fairly be described as extraordinary" (majority op at 7). For starters, while I agree that the Legislature intended that courts would have discretion in making an extraordinary circumstances determination, such discretion is not meant to be boundless. The majority ignores extensive comments in the Assembly Debate which give meaning to the term "extraordinary circumstances." I see no reason why we would not look there for guidance. Although we surely need not take literally the ratio of 1 out of every 1000 cases, the sponsor made clear that a finding of extraordinary circumstances should be quite rare, and that a court's analysis of all the circumstances should consider whether the facts are "highly unusual and heinous" and whether the defendant is amenable to services (Assembly Debate at 39). According to the majority, the record here suffices because the defendant "had been arrested repeatedly, was frequently in Family Court, and had received many services" and he "participated in a preplanned home invasion in which he displayed a knife" (majority op at 7)[FN4]. I disagree that such sparse facts can support the court's finding.
First, the majority relies, as did the courts below, on the defendant's Family Court history as evidence that he was not amenable to services [FN5]. But the record establishes only that the [*6]defendant had received services for five years and that he had eight tickets and two adjudications.
As to the history of services, the People's evidence consisted of merely a list of the names of the services received. No evidence was adduced regarding what each service entailed, whether the services were appropriate in light of the defendant's multiple mental health conditions, or how the defendant responded to the services that were provided. Such a record is insufficient to demonstrate that the defendant "would not benefit in any way" from further treatment (Assembly Debate at 39), and I would thus hold that the People did not meet their burden on this point.
As to the eight tickets and two adjudications, I fail to see how the People's limited evidence of the defendant's re-offense, without more, constitutes "strong proof" that he would not benefit from additional services (id.). The statute is intended to give 16- and 17-year-olds access to "superior services" instead of adult punishment because they are "immature" and deserve "an opportunity to get back on the right track" (id. at 21, 86). Given the statute's structure and purpose, the key question is whether a "possibility exists that [the defendant's] deficiencies will be reformed" (Roper, 543 US at 570). If so, that young person deserves an opportunity to receive services instead of adult punishment; if not, they should be placed in the adult criminal justice system.
Only in the rarest cases should the mere fact of repeated involvement in the juvenile justice system suffice as proof that a youth is not amenable to services. Sadly, many young people who receive Family Court services re-offend. In 2023, the youth felony recidivism rate in New York City was 32.3% (NYC Mayor's Office of Criminal Justice, NYC Youth Crime in Context: Arrest & Recidivism [2025], https://criminaljustice.cityofnewyork.us/reports/nyc-youth-crime-in-context-arrest-recidivism [last accessed Jan. 23, 2026]). And "state-level data on recidivism consistently show that youth who are released from correctional confinement experience high rates of rearrest, new adjudications (in juvenile court) or convictions (in adult court), and reincarceration" (Richard Mendel, Why Youth Incarceration Fails: An Updated Review of the Evidence [March 1, 2023], https://www.sentencingproject.org/reports/why-youth-incarceration-fails-an-updated-review-of-the-evidence [last accessed Jan. 23, 2026]; see also The Annie E. Casey Foundation, No Place for Kids: The Case for Reducing Juvenile Incarceration at 10 [2011], available at https://assets.aecf.org/m/resourcedoc/aecf-NoPlaceForKidsFullReport-2011.pdf [last accessed January 23, 2026] [70% to 80% of youth released from residential corrections program were rearrested within 2-3 years]).
Indeed, recidivism is precisely one of the problems that Raise the Age meant to address (see Assembly Debate at 90, 211; Assembly Mem in Support of 2017 NY Assembly Bill A04935). Raise the Age meant to shape better outcomes for youth who become system-involved—those who have faced substantial challenges and need "to get back on the right track" (Assembly Debate at 86). Treating re-offense by system-involved young people as "extraordinary" in and of itself would therefore defeat the purpose of the statute.
Nor can the nature of the defendant's crime here support a finding of extraordinary circumstances, as the structure of the statute confirms [FN6]. The gravity of the offense should not be [*7]minimized: it was violent, it was preplanned, and the defendant wielded a kitchen knife. But those circumstances could readily describe any burglary, robbery, or other violent felony, and violence alone does not preclude removal. The statute specifically provides that all violent felonies as defined in Penal Law § 70.02 are presumptively removable to Family Court (CPL 722.23 [2] [a], [c]). Removal is automatically barred only if the People prove one of the three enumerated conditions; if not, the default presumption applies, and the People must show extraordinary circumstances. Finding an offense "extraordinary" based merely on its elements or its violent nature would allow the exception to be invoked for essentially any violent felony — an outcome that would be fundamentally inconsistent with the structure of the statute.
The legislative history confirms this view. The bill's sponsor indicated that an extraordinary circumstances determination requires consideration of whether there are "highly unusual and heinous facts" — for example, "a series of serious crimes committed . . . over the course of many days" (id. at 40); a defendant who "act[ed] in an especially cruel and heinous manner," such as by targeting a particularly vulnerable victim (id.; see also id. at 43 [a young person targeting "an elderly person" could constitute ground for extraordinary circumstances]); or a defendant who was "a ringleader who threatened and coerced reluctant youths to participate" in a crime (id. at 40). While not exhaustive, the examples underscore that removal can only be prevented in the rarest of cases.
The record reveals no circumstances along these lines. Indeed, the facts of the crime here are arguably less serious than those in many cases where courts have ordered removal to Family Court (see e.g. M.M., 64 Misc 3d at 264-66 [no extraordinary circumstances where a defendant was charged with four felonies, including three counts of first-degree robbery, allegedly committed across a two month period]; People v T.P., 73 Misc 3d 1215[A], 2021 NY Slip Op 51048[U], *4 [2021] [no extraordinary circumstances where a defendant stole two cars, crashed one of them into a police vehicle, and fled the scene]; J.J., 2022 NY Slip Op 50211[U], *4 [no extraordinary circumstances where a defendant deliberately lit fire to the children's home in which he was a resident, while knowing several others were present]).
What the record on the removal motion does show, though, is a host of mitigating circumstances. At 17, the defendant was only in the 10th grade, had been diagnosed with several mental health conditions which he managed via medication and therapy, and had never fully recovered from the murder of his father. The Legislature intended for the court to consider such factors in making its extraordinary circumstances determination. Although extraordinary circumstances do not exist in the defendant's case even without these mitigating factors, they further confirm that County Court abused its discretion.IV
In short, nothing in this record—neither the limited evidence of the defendant's re-offense nor the nature of the crime—can support a finding of extraordinary circumstances. Youth Part judges have significant discretion to determine when to grant a motion by the People to prevent removal (see majority op at 6), but the statutory structure and legislative history constrain that discretion, as they do whenever a court applies a statute. The statute treats violent felonies as presumptively removable. And the legislative history confirms that the goal of Raise the Age is to treat "kids' lives [as] worth saving" by giving them services, rather than locking them in adult prisons, so they have a shot at "better outcomes for their lives" (Assembly Debate at 21, 74). To fulfill that promise, "extraordinary circumstances" must be "a high standard" meant for only the rarest of cases (id. at 38), rather than for the many system-involved youth [*8]who return to Family Court. In light of that objective, I would not conclude that the record here evinces the requisite "strong proof" that the defendant cannot benefit from services in any way. Accordingly, I dissent.
Order affirmed. Opinion by Judge Troutman. Judges Garcia, Singas and Cannataro concur.
Judge Halligan dissents in an opinion, in which Chief Judge Wilson and Judge Rivera concur.
Decided February 17, 2026

Footnotes

Footnote 1: The People conceded that none of those grounds is present here.

Footnote 2: Although the record is silent as to "what each service entailed" (dissenting op at 10), we presume that the experienced judge who was assigned to decide the People's motion was familiar with the nature of the services available in that Family Court. We note that judges assigned to the youth part are Family Court judges or superior court judges deemed qualified based on their training and experience (see CPL 722.10 [1]).

Footnote 1: Although the victim testified at trial that "one of the kids . . . had what looked to be a gun in the front sweater pocket," the record lacks any evidence that one of the co-defendants in fact displayed a gun, and surveillance video of the co-defendants near the scene does not show any of them carrying a gun. The only gun that police recovered was the one belonging to the victim.

Footnote 2: Between 1997 and 2023, the number of juveniles held in adult facilities decreased by 83% nationally as states reformed their juvenile justice policies (Joshua Rovner, Youth Justice by the Numbers [Nov. 20, 2025], https://www.sentencingproject.org/policy-brief/youth-justice-by-the-numbers/ [last accessed Jan. 23, 2026]).

Footnote 3: The version of Raise the Age which ultimately passed technically did not have a sponsor, because it was part of budget legislation. The bill had various earlier iterations (see e.g. 2017 NY Assembly Bill A04935) which did have a sponsor, and in the Assembly Debate on the budget legislation, legislators directed questions about Raise the Age to the sponsor of the earlier bills.

Footnote 4: The majority also asserts that "his accomplices' conduct in displaying firearms would have mandated retention of the case by the youth part if defendant had done so himself" (majority op 7). County Court made no such finding, nor did the Appellate Division rely on any aspect of the co-defendants' conduct.

Footnote 5: Family Court Act § 381.2 (1) provides that "[n]either the fact that a person was before the family court under this article for a hearing nor any confession, admission or statement made by him to the court or to any officer thereof in any stage of the proceeding is admissible as evidence against him or his interests in any other court." The defendant argues that this provision precludes any use of his juvenile delinquency history. A number of lower courts have interpreted section 381.2 (1) as barring the People from using a youth's juvenile delinquency history "in any way . . . in any application for removal under [CPL 722.23]," but have nonetheless considered evidence of a defendant's re-offense and services in deciding extraordinary circumstances motions (People v J.J., 74 Misc 3d 1223[A], 2022 NY Slip Op 50211[U], *3-4 [Ulster County Ct 2022]; People v D.J., 78 Misc 3d 1232[A], 2023 NY Slip Op 50405[U], *1 [Erie County Ct 2023]; People v J.K., 78 Misc 3d 1221[A], 2023 NY Slip Op 50312[U], *2-3 [Erie County Ct 2023]). Although the defendant's argument here is unpreserved, it reveals a puzzling inconsistency that the Legislature may wish to address, or that this Court may wish to clarify in a proper case.

Footnote 6: Although County Court did not explicitly rely on the violent nature of the defendant's crime, the Appellate Division did. The majority references that the defendant "participated in a preplanned home invasion in which he displayed a knife" (majority op at 7), but its affirmance appears to rest solely on County Court's finding that the defendant was not amenable to services.